John DOE, Plaintiff,

v.

William F. WELD, et al., Defendants.

Civ. A. No. 96–11968–PBS.

United States District Court,
D. Massachusetts.

Dec. 17, 1996.

Dana A. Curhan, Thomas Hoopes, Boston, for plaintiff.

Loretta M. Smith, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### I. *INTRODUCTION*

This case challenges the constitutionality of the newly-enacted sex offender registry law as it applies to juveniles adjudicated delinquent prior to its enactment. The plaintiff is a nineteen year-old college student who, at the age of seventeen, pled guilty to four counts of indecent assault and battery on a child and was sentenced as a juvenile to four months probation. Plaintiff seeks an injunction and a declaration that the "Act Relative to Sex Offender Registration and Community Notification" ("The Act"), also known as "Megan's Law," is unconstitutional under the federal and state constitutions because it applies retroactively to juvenile sex offenders in violation of the Ex Post Facto, Bill of Attainder, Double Jeopardy and Due Process clauses, as well as the "cruel and unusual punishment" prohibition of the Eighth Amendment.

After a hearing, for the following reasons, this Court **DENIES** plaintiff's motion for a preliminary injunction.

## II. *BACKGROUND*

### A. *The Legislation*

On August 5, 1996, Massachusetts enacted "Megan's Law," Mass.G.L. c. 6, §§ 178C—178O, and joined the forty-nine other states that have adopted legislation specifically designed to address both national and local concerns about repeat sex offenders. *See, e.g.,* Ariz.Rev.Stat.Ann. §§ 13–3821 to –3825 (West 1994); Cal.Penal Code §§ 290 to 290.6 (West Supp.1995); Ga.Code Ann. § 42–9–44.1 (1995); Mich.Comp.Laws Ann. §§ 28.721 to .732 (West Supp.1995); *see also* Jacob Wetterling Crimes Against Children & Sexually Violent Offender Registration Program, 42 U.S.C. § 14071 (1994), *as amended,* 1996 (encouraging state legislation by conditioning law enforcement funds on the implementation of the prescribed sex offender registration program); Note, *Prevention Versus Punishment: Toward a Principled Distinction in the Restraint of Released Sex Offenders,* 109 Harv.L.Rev. 1711, 1712–14 (1996) (describing the various laws that "convicted sex offender[s] today can expect to encounter" in most states). Although sex offender registration and community notification laws vary, Massachusetts's "Megan's Law" is similar to the registration schemes that other states have adopted. *Compare* Mass.G.L. c. 6, §§ 178C—178O *with* Wash.Rev.Code Ann. § 9A.44130(2) (West Supp.1996) *and* N.J.Stat.Ann. §§ 2C:7–6 to –11 (West 1995).

The Act establishes: (1) a centralized, computerized registry of information regarding the state's sex offenders, and (2) a three-tiered system whereby registration information, including an offender's name, home and work addresses, personal characteristics, and photograph, may be distributed to the public. *See* Mass.G.L. c. 6, §§ 178D, 178K(2). The Act applies to any "sex offender," defined as "a person convicted of a sex offense or who has been adjudicated as a youthful offender or as a delinquent juvenile by reason of a sex offense ... on or after August first, nineteen hundred and eighty-one." G.L. c. 6, § 178C.

### 1. *Registration*

The Act provides that, prior to October 1, 1996, all sex offenders must furnish the police departments where they reside with current data regarding their offense, date and place of birth, social security number, home and work addresses, eye and hair color, weight, height, and anything else "which may be useful in identifying the sex offender" or "in assessing the risk of the sex offender to reoffend." *See* Mass.G.L. c. 6, §§ 178E(h), 178D. Upon receiving such information, the police department transmits the registration data to the state's Criminal History Systems Board ("CHSB") which, in turn, forwards the data to "the police departments where the sex offender works and where the offense was committed and to the Federal Bureau of Investigation." G.L. c. 6, § 178E(h).

Registered sex offenders must "appear in person at least one time per year at the local police department to verify that the registration data on file remains true and accurate." G.L. c. 6, § 178F. In addition, offenders must sign and promptly return a verification form that is mailed annually to the listed address. *Id.* Any offender who intends to move must register in person with the police in the new area at least five days prior to establishing a new residence; any offender who changes jobs must "notify the police department where he resides in writing five days prior to establishing his new work address." G.L. c. 6, § 178E(e), 178(f).

The Act provides that a sex offender's obligation to maintain current and accurate registration information is to last for twenty years from the date of conviction or release (whichever is later); however, if the offender has committed a sex offense on more than one occasion, the duty to register persists for the rest of his life. *See* G.L. c. 6, § 178G. If a registered offender can provide clear and convincing evidence that he has not engaged in a sex crime for at least fifteen years and that he is "not likely to pose a threat to the safety of others," he may apply to the Board to have the duty to register terminated. G.L. c. 6, § 178G.

Knowing failure to register or to update registration data as required is a crime punishable "by imprisonment for not more than two and one-half years" and/or "by a fine of not more than one thousand dollars." G.L. c. 6, § 178H.

### 2. *Public Dissemination*

The Act also authorizes public disclosure of sex offender registration data. It establishes a Sex Offender Registry Board ("Board"), a subdivision of the CHSB, which is responsible for "determining the level of risk of reoffense of sex offenders," "assess[ing] the risk level of particular offenders," and "develop[ing] guidelines for use by city and town police departments in disseminating sex offender registry information." G.L. c. 6, § 178K(1). The Act "provide[s] for three levels of notification depending on the degree of the risk of reoffense by the sex offender." G.L. c. 6, § 178K(2). An offender with a low risk of reoffense as determined by the Board is given a "Level One" designation; a moderate risk offender is designated "Level Two"; a high risk offender is designated "Level Three." G.L. c. 6, § 178K(2). When ascertaining an offender's risk level, the Board is authorized to consider materials submitted by the offender, statements made by the victim, and a number of factors including "whether the sex offender was a juvenile when he committed the offense." G.L. c. 6, §§ 178K(e), (k), (1).

A person who requests sex offender registry information for Level One offenders must follow certain statutory requirements set forth in sections 178I and J. *See* G.L. c. 6, § 178K(2)(a). Section 178I provides that any adult, upon "the verification of his age and identity, shall receive at no cost from the board a report" which indicates whether an identified individual is a sex offender, the offense, and the date of conviction or adjudication. The section also provides that any "records of inquiry" will be kept confidential, and that the person making the inquiry must be warned of the criminal penalties for misusing the information.

Section 178J(a) sets forth the procedures and the specific circumstances under which a person may obtain registry information about a Level One offender. *See* § 178K(2)(a). It provides that a "person who requests sex offender registry information" must be eighteen years of age or older, must appear in person at the local police precinct and present proper identification, and must state that the registry information is for her "own protection or for the protection of a child" or other person for whom she has responsibility, care, or custody. The person must also complete and sign a "record of inquiry," referenced in section 178I, which includes the name and address of the inquirer, the person or geographic area or street that is the subject of the inquiry,[1] the reason for the inquiry, the date and time, and "a warning regarding the criminal penalties for use of sex offender registry information to commit a crime or to engage in illegal discrimination or harassment of an offender."[2] G.L. c. 6, § 178J(a). Upon the submission of a signed record of inquiry, the police are authorized to release a broader range of information than must be provided by the Board.[3]

An offender who is subject to Level One public disclosure as set forth in sections 178I and 178J has no statutory right to administrative or judicial review of the risk level designation. *See* G.L. c. 6, § 178K(3).

Sex offenders who receive a Level Two or Three designation face a more aggressive system of public disclosure. "A level two community notification plan shall require the police department to notify organizations in the community which are likely to encounter the offender including, but not limited to, schools, day care centers, religious and youth organizations, and sports leagues," with information such as the offender's name, home

---

1. A person seeking registration information must identify a specific individual, inquire whether any sex offenders live or work within a one mile radius of a specific address (like a residence or day care center), or inquire whether a sex offender lives or works on a specific street. G.L. c. 6 § 178J(b).

2. Such penalties include a fine of not more than one hundred dollars or imprisonment for not more than six months pursuant to Mass.G.L. c. 253, § 4.

3. Section 178J(c) requires the police to disseminate to the inquirer the following: the name of the offender, his home and work address if within the geographic area which is the subject of the permitted inquiry, the offense, certain descriptive information (like eye and hair color), and a photograph. The record of inquiry must remain confidential, unless it is needed to assist in a criminal prosecution. *See* § 178J(a).

and work addresses, the date and nature of the offense, the offender's age, sex, race, age, height, hair and eye color, and any available photograph. G.L. c. 6, § 178K(2)(b). Information regarding a Level Three offender is distributed not only to affected community organizations, but also to "individual members of the public which are likely to encounter the offender." G.L. c. 6, § 178K(2)(c). As with the Level One inquiries, "[a]ll notices to the community" regarding Level Two or Three offenders "shall include a warning regarding the criminal penalties for use of the sex offender registry information" in an illegal and improper way. G.L. c. 6, § 178K(2)(b), (c). Unlike Level One offenders, however, Level Two or Three offenders have the right "to challenge [their] risk designation" in a petition brought before a superior court judge. G.L. c. 6, § 178M.

## B. *The Juvenile Sex Offender*

In November of 1994, nearly two years prior to the enactment of the registration and community notification law, plaintiff Doe, a minor, was adjudicated a delinquent after pleading guilty to four counts of indecent assault and battery on a child under the age of fourteen. *See* Mass.G.L. c. 265, § 13B. The indecent assault charges were the plaintiff's first offense, and the state court sentenced him to four months probation. At the time of this disposition, Massachusetts law explicitly provided that juvenile records were not available for public inspection without judicial consent,[4] and counsel advised plaintiff of the confidentiality of the disposition when he entered the plea.

On March 15, 1995, plaintiff turned eighteen, and thereafter, he began attending college. Plaintiff's term of probation has ended, and he has not been accused of committing any other offenses either prior to or since his 1994 delinquency proceeding.

Sometime after the enactment of "Megan's Law" in August of 1996, plaintiff was informed that he was obligated to register as a sex offender and that information regarding his offense was subject to public disclosure under the new law. On September 30, 1996, plaintiff filed a complaint and a motion for an ex parte temporary restraining order and a preliminary injunction in this Court, alleging that the state law as it applies to juvenile sex offenders is unconstitutional. This Court denied the plaintiff's motion to proceed ex parte; however, the government agreed to defer enforcement of the law against the plaintiff pending this Court's determination of plaintiff's motion for a preliminary injunction and, presumably, pending an appeal from this Court's ruling.

## III. *DISCUSSION*

### A. *Legal Standard for a Preliminary Injunction*

"The purpose of a preliminary injunction is to preserve the status quo, freezing an existing situation so as to permit the trial court, upon full adjudication of the case's merits, more effectively to remedy the discerned wrongs." *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.,* 48 F.3d 618, 620 (1st Cir.1995). This court must "determine the appropriateness of granting or denying a preliminary injunction on the basis of a four-

---

4. The laws regarding the confidentiality of juvenile records have recently been amended. *See* H.B. No. 5876, c. 200, § 6 (July 27, 1996) *amending* Mass.G.L. c. 119, § 60A. At the time of plaintiff's plea, Mass.G.L. c. 119, § 60A provided:

   The records of the court, including those of a juvenile appeals session, in all cases of delinquency arising under sections fifty-two to fifty-nine, inclusive, shall be withheld from public inspection except with the consent of a justice of such court, but such records in any such case against any particular child shall be open, at all reasonable times, to the inspection of the child, his or her parent or parents, guardian and attorney, or any of them.

   Notwithstanding the provisions of this section, the name of a child shall be made available to the public by the probation officer without such consent if the child is: alleged to have committed an offense while between his fourteenth and seventeenth birthdays; and has previously been adjudicated delinquent on at least two occasions for acts which would have been punishable by imprisonment in the state prison if such child had been age seventeen or older; and is charged with delinquency by reason of an act which would be punishable by imprisonment in the state prison if such child were age seventeen or older.

part test." *Sunshine Development, Inc. v. Fed. Deposit Insur. Corp.,* 33 F.3d 106, 110 (1st Cir.1994); *accord Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st. Cir.1981). The inquiry requires a consideration of:

1. The likelihood of success on the merits;

2. The potential for irreparable injury;

3. A balancing of the relevant equities (most importantly, the hardship to the nonmovant if the restrainer issues as contrasted with the hardship to the movant if the interim relief is withheld); and

4. The effect on the public interest of a grant or denial of the restrainer.

*Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991); *accord TEC Engineering Corp. v. Budget Molders Supply, Inc.,* 82 F.3d 542, 544 (1st Cir.1996); *Gately v. Commonwealth,* 2 F.3d 1221, 1224 (1st Cir.1993), *cert. denied* 511 U.S. 1082, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994).

Because "[t]he sina qua non of [this] formulation is whether the plaintiffs are likely to succeed on the merits," courts have determined that "plaintiffs who are unable to convince the trial court that they will probably succeed on the merits will not obtain interim injunctive relief." *Weaver v. Henderson,* 984 F.2d 11, 12 (1st Cir.1993); *see e.g., LeBeau v. Spirito,* 703 F.2d 639, 645 (1st Cir.1983). Even where ultimate success is likely, however, a movant must also demonstrate that the balance of equities falls in his favor, for "the heart of the matter is whether 'the harm caused plaintiff without the injunction, in light of the plaintiff's eventual success on the merits, outweighs the harm the injunction will cause defendants.' " *United Steelworkers v. Textron, Inc.,* 836 F.2d 6, 7 (1st Cir. 1987) (quoting *Vargas–Figueroa v. Saldana,* 826 F.2d 160, 162 (1st Cir.1987)).

### B. *Constitutional Terrain*

The plaintiff relies primarily on the Ex Post Facto, Bill of Attainder, and Double Jeopardy clauses of the United States Constitution, and the corresponding state constitutional provisions, in support of his argument that he has a likelihood of success in establishing that the retroactive application of the Act to juvenile sex offenders is unconstitutional. A brief review of these basic constitutional tenets follows.

### 1. *The Ex Post Facto Clause*

■ Art. I, sec. 10 of the U.S. Constitution provides that "[n]o State shall ... pass any ... Ex Post Facto Law." The Ex Post Facto clause is implicated when the government seeks to apply retroactively legislation that "inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull,* 3 U.S. (3 Dall.) 386, 390, 1 L.Ed. 648 (1798). The core principle underlying the Ex Post Facto clause is that of "fair warning." *Miller v. Florida,* 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987) (internal quotation marks omitted); *accord Landgraf v. USI Film Products,* 511 U.S. 244, 265, 114 S.Ct. 1483, 1497, 128 L.Ed.2d 229 (1994) ("Elementary considerations of fairness dictate that an individual should have an opportunity to know what the law is and to conform their conduct accordingly."); *Weaver v. Graham,* 450 U.S. 24, 30, 101 S.Ct. 960, 965, 67 L.Ed.2d 17 (1981) ("Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint. . . ."). A person must have notice "not only of the conduct that will subject him to punishment but also of the severity of the penalty that the State may impose." *BMW of North America v. Gore,* —— U.S. ——, ——, 116 S.Ct. 1589, 1598, 134 L.Ed.2d 809 (1996).

### 2. *Bills of Attainder*

■ The prohibition against Bills of Attainder, Art I, sec. 10 cl. 1, forbids "[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a trial." *United States v. Brown,* 381 U.S. 437, 448–49, 85 S.Ct. 1707, 1714–15, 14 L.Ed.2d 484 (1965). The assignment of a penalty to certain persons without trial violates fundamental constitutional principles because, in so doing, "the legislature ... circumvent[s] the judicial process." *Artway*

v. Attorney Gen. of New Jersey, 81 F.3d 1235, 1253 n. 15 (3rd Cir.1996); accord De-Veau v. Braisted, 363 U.S. 144, 160, 80 S.Ct. 1146, 1155, 4 L.Ed.2d 1109 (1960); see also Nixon v. Admin. of Gen. Serv. et al., 433 U.S. 425, 480, 97 S.Ct. 2777, 2809, 53 L.Ed.2d 867 (1977) (finding that the Bill of Attainder clause was prompted by "the fear that the legislature, in seeking to pander to the inflamed popular constituency, will find it expedient openly to assume the mantle of judge— or worse still, lynch mob").

### 3. The Double Jeopardy Clause

■ The Double Jeopardy clause, which appears in the Fifth Amendment to the U.S. Constitution, provides that no person "shall ... be subject for the same offence to be twice put in jeopardy of life or limb." Whatever its possible scope, the Clause explicitly prohibits the government from imposing multiple punishments for a single crime. See United States v. Ursery, — U.S. —, —, 116 S.Ct. 2135, 2139, 135 L.Ed.2d 549 (1996); United States v. Halper, 490 U.S. 435, 440, 109 S.Ct. 1892, 1897, 104 L.Ed.2d 487 (1989) ("If there is anything that is settled in the jurisprudence of England and America, it is that no man can be twice lawfully punished for the same offence.") (quoting Ex Parte Lange, 18 Wall. 163, 168, 21 L.Ed. 872 (1873)).

### C. Punishment

Because the plaintiff's Ex Post Facto, Bill of Attainder, and Double Jeopardy challenges hinge on the concept of "punishment," the threshold issue in an assessment of plaintiff Doe's likelihood of success on these claims is whether the Act "punishes" juvenile sex offenders. See Opinion of the Justices, 423 Mass. 1201, 1218, 668 N.E.2d 738, 747 (1996); Doe v. Pataki, 919 F.Supp. 691, 698 (S.D.N.Y.1996) (finding that, in an Ex Post Facto challenge to registration and community notification, "the critical issue before me is whether the Act is punitive or regulatory"). Unfortunately, "the law on punishment is complicated and in some disarray." Artway v. Attorney Gen. of N.J., 81 F.3d 1235, 1242 (3rd Cir.1996). The Supreme Court's decision in United States v. Ursery, — U.S.

—, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), must be the starting point for discerning the appropriate test.

In Ursery, the Supreme Court held that in rem civil forfeitures "are neither punishment nor criminal for purposes of the Double Jeopardy Clause." Ursery, — U.S. at —, 116 S.Ct. at 2149 (internal quotation marks omitted). After reviewing its former forfeiture decisions and distinguishing cases that involved the Excessive Fines Clause, civil penalties, and tax schemes, see id. at — —, 116 S.Ct. at 2142–2147, the Court relied on a two-pronged test to determine whether a civil forfeiture proceeding constitutes a second "punishment" that is impermissible under the Double Jeopardy Clause. See id. at —, 116 S.Ct. at 2147. At the first stage, the Ursery Court considered whether the legislature "intended [the] proceedings ... to be criminal or civil." Id. At the second, the Court determined "whether the proceedings are so punitive in fact as to persuade us that the forfeiture proceeding[s] may not legitimately be viewed as civil in nature, despite Congress's intent." Id. In evaluating whether the forfeiture laws "are so punitive in form and effect as to render them criminal despite Congress's intent" (the second stage), id. at —, 116 S.Ct. at 2148, the Court looked at various considerations including the importance of the nonpunitive goals of forfeiture proceedings, the historical characterization of forfeiture, and the fact that scienter is not required. See id. at — – —, 116 S.Ct. at 2148–49.

At least one federal court has found that the Ursery test controls the determination of whether registration and community notification laws impose "punishment" on sex offenders. See W.P. v. Poritz, 931 F.Supp. 1199, 1208 (D.N.J.1996). Two post-Ursery decisions have developed other multi-factor tests for determining the dispositive issue of punishment in this context. In Roe v. Office of Adult Probation et al., 938 F.Supp. 1080, 1091–93 (D.Conn.1996), a successful Ex Post Facto challenge to Connecticut's "Megan's Law," the District Court focused on the seven factors that the Supreme Court set forth in Kennedy v. Mendoza–Martinez, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), an

opinion involving Fifth and Sixth Amendment challenges to a federal law divesting draft-dodgers of national citizenship:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned.

*Mendoza–Martinez*, 372 U.S. at 168–69, 83 S.Ct. at 567–68 (concluding that divestiture of citizenship was punitive in nature). These factors are similar to those considered in *Ursery*. But see *Artway v. Attorney Gen.*, 81 F.3d at 1262–63 (describing these seven factors as a "grab-bag of many individual tests" which are not dispositive or controlling).

Similarly, the district court in *Doe v. Pataki*, 940 F.Supp. 603 (S.D.N.Y.1996), which was faced with an Ex Post Facto challenge to New York's "Megan's Law," determined that "[t]he most logical approach, and the approach most consistent with the Supreme Court case law on whether government action is 'punishment,' is to analyze the circumstances by grouping them" in the following four areas: intent, design, history, and effects. *Id.* at 620. Rather than adhering strictly to a particular set of factors, the *Pataki* court concluded that "one must look at the totality of the circumstances, keeping in mind the definition and purposes of punishment and the purposes of the Ex Post Facto Clause." *Id.* at 620.

In the pre-*Ursery* era, the First Circuit formulated a test for determining whether a civil sanction constitutes "punishment" for purposes of Double Jeopardy. In *Allen v. Attorney Gen.*, 80 F.3d 569 (1st Cir.1996), the defendant filed a habeas corpus petition claiming that his criminal prosecution for operating a motor vehicle under the influence of alcohol ("OUI") was foreclosed by the state's previous 90–day revocation of his driver's license for the same incident. *Id.* at 571–72. Borrowing from *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), the *Allen* court set forth the following "analytic framework" for determining whether a civil sanction is a "disguised punishment":

> [C]ourts must examine 'the totality of the circumstances, including the source of the authority under which the [civil sanction] is imposable, the goals underpinning the authorizing statute, the order itself, the purposes it serves, and the circumstances attendant to its promulgation.' If this holistic examination indicates that the sanction is better characterized as remedial rather than punitive, it will not be deemed to constitute punishment for Double Jeopardy purposes.

*Allen*, 80 F.3d at 573 (quoting *United States v. Stoller*, 78 F.3d 710, 721–24 (1st Cir.1996) (holding that civil debarment order does not violate Double Jeopardy using framework described above), *cert. dismissed*, —— U.S. ——, 117 S.Ct. 378, 136 L.Ed.2d 297 (1996)). The First Circuit held the suspended license sanction to be "principally in service to a remedial goal" and the subsequent criminal prosecution was, thus, not violative of the Double Jeopardy Clause. *Id.* at 577; *cf. Taylor v. State*, 101 F.3d 780, 783 (1st Cir. 1996) (rejecting an Ex Post Facto challenge to an offender fee statute because, under the *Halper* punishment test, the program bears a "rational relation to the goal of compensating the [State] for its loss").

While there is no talismanic definition of punishment, the *Ursery* framework is "a useful analytical tool" for determining whether a sex offender registration and community notification law is punitive. *Ursery*, —— U.S. at ——, 116 S.Ct. at 2147. The *Ursery* analysis allows for consideration of the intent of the legislature, the practical effect of the legislation, the purpose of the statute, and analogous historical precedents—the holistic factors that are addressed by most of the courts in most all of the sex offender cases. *See, e.g., Artway v. Attorney Gen.*, 81 F.3d 1235, 1264–67 (3rd Cir.1996); *Doe v. Pataki*, 940 F.Supp. 603, 620 (S.D.N.Y.1996); *see also Opinion of the Justices*, 423 Mass. 1201,

1222, 668 N.E.2d 738, 749 (1996) (questioning "whether the Court in *Ursery* meant to repudiate the test outlined in *Mendoza–Martinez* altogether").

### D. *Likelihood of Success—Ex Post Facto, Bill of Attainder, Double Jeopardy*

To prevail on his Ex Post Facto, Bill of Attainder, and Double Jeopardy challenges, the plaintiff must establish a likelihood of success in proving that (1) the Massachusetts legislature intended to punish juvenile sex offenders, or (2) the legislation is "so punitive in form and effect" as to render it punishment regardless of the legislature's remedial intent. *Ursery*, ——— U.S. at ———, 116 S.Ct. at 2147; *see also United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 365, 104 S.Ct. 1099, 1106, 79 L.Ed.2d 361 (1984) (finding that "only the clearest proof that the purpose and effect . . . are punitive will suffice" (internal quotation marks omitted)).

Although plaintiff Doe has not yet registered or been assigned a risk level, the government indicated at the hearing on his preliminary injunction motion that, with a sentence of four months probation and no prior or subsequent criminal record, the plaintiff would probably be designated a "Level One" offender. This Court assumes as much for the purpose of deciding this motion for preliminary injunction.[5]

#### 1. *Intent*

The history of "Megan's Law" indicates that the Massachusetts legislature desired to assist law enforcement officials in the prevention and investigation of sex crimes and, when necessary, to "allow particular members of the public who are in an especially vulnerable situation . . . to take measures lawfully available to them to protect themselves against danger." *Opinion of the Justices*, 423 Mass. 1201, 1227, 668 N.E.2d 738, 752 (1996); *see also* H.R. 5949, at § 174A(2) (Ma.1996) (Legislative Findings and Purpose). The Supreme Judicial Court recently determined that "[s]uch a purpose is plainly

regulatory in that it seeks to prevent harm." *Opinion of the Justices*, 423 Mass. at 1227, 668 N.E.2d at 752.

Only one comment addressing juveniles appears in the legislative history of the statute. During debates, one legislator remarked:

> I'm disappointed that there is no language here addressing juveniles who are arrested for sex offenses. . . . [T]hey will be subject to this law. Some 750 youths have gone through treatment in DYS. There has not been one who has gone back. They should have their confidentiality protected. We want juveniles punished but we also should give them the opportunity [to] become productive citizens. They have long lives. I hope we will make further attempts in this area.

State House News Service, July 30, 1996 (statement of Rep. Paulsen). Transcripts reveal no legislative comments referring to sex offenders as "animals," or suggesting that the legislature harbored a collective intent to punish juvenile sex offenders. *Contrast Doe v. Pataki*, 940 F.Supp. 603, 621–22 (S.D.N.Y. 1996) (highlighting legislators' statements that reveal a "passion, anger, and desire to punish," such as the belief that sex offenders are the "human equivalent of toxic waste"). Rather, the inclusion of juveniles in "Megan's Law" signals a broad, nonpunitive desire to "protect children and other vulnerable populations from potential harm" caused by juvenile sex offenders. H.R. 5949, at § 174A(2) (Ma.1996) (Legislative Findings and Purpose); *see also Doe v. Poritz*, 142 N.J. 1, 74, 662 A.2d 367, 404 (1995) (finding that New Jersey's "Megan's Law" covered juvenile sex offenders who, like the mentally insane, were "an unlikely target for double punishment but included for remedial protective purposes").

#### 2. *Form and Effect*

Plaintiff argues that the Act as it is applied to Level One juvenile sex offenders is so punitive in form and effect that it should be

---

**5.** This opinion does not address whether juveniles who are given a Level Two or Three designation are likely to prevail on the merits of their constitutional claims; nor does it consider the effect of "Megan's Law" on those Level One juvenile offenders whose records already have been sealed pursuant to G.L. c. 276, § 100B.

considered "punishment" regardless of the legislature's remedial intent. In this analysis, it is helpful to consider separately the Act's registration and community notification provisions.

### a. *Registration*

■ "Virtually every court that has considered the issue of whether registration is punishment for purposes of the Ex Post Facto Clause has held that it is not." *Pataki*, 940 F.Supp. at 629. *See e.g., Artway v. Attorney Gen. of N.J.*, 81 F.3d 1235, 1253–67 (3rd Cir.1996); *Rowe v. Burton*, 884 F.Supp. 1372, 1377–80 (D.Alaska 1994); *State v. Myers*, 260 Kan. 669, 695, 923 P.2d 1024, 1041 (1996); *State v. Noble*, 171 Ariz. 171, 178, 829 P.2d 1217, 1224 (1992); *but see State v. Payne*, 633 So.2d 701, 703 (La.Ct.App. 1993). As in other states, a sex offender in Massachusetts need only complete and update a standardized form requesting information that is relevant to his identification and to his whereabouts in order to satisfy the registration requirement. It is clear that the "essentially ministerial action of registration does not restrain or inhibit the sex offender's activities in any significant way." *Pataki*, 940 F.Supp. at 630, 81 F.3d at 1267; *see also Artway v. Attorney General*, 81 F.3d at 1267 (finding that registration "cannot be said to have an effect so draconian that it constitutes 'punishment' in any way approaching incarceration").

Plaintiff Doe argues that, regardless of whether the registration requirement punishes adult offenders, registration is punitive when it is required of juveniles who were promised confidentiality and who were not told at the time of the plea of the possibility that their records could be used by enforcement officials in the future. Plaintiff is unlikely to prevail on this contention. *See Matter of Appeal in Maricopa County Juvenile Action*, —— Ariz. ——, ——, 933 P.2d 1248, 1251 (Ariz.App.Div.1996) (rejecting argument that registration is punishment because it "affects juveniles more harshly than it does adults"). Massachusetts has long provided that, with respect to juveniles, "[t]he maintenance of fingerprint, photograph and arrest records serves an important law enforcement

function." *Police Commissioner of Boston v. Municipal Court*, 374 Mass. 640, 655, 374 N.E.2d 272, 281 (1978). Moreover, even if *public* access to juvenile court proceedings is restricted pursuant to G.L. c. 119, § 60A, that statutory protection has not been found to apply to *police* investigations. *Commonwealth v. Shipps*, 399 Mass. 820, 831–33, 507 N.E.2d 671, 679–80 (1987) (permitting police to use a photograph of a juvenile offender in subsequent police probes). The collection and use of juvenile offenders' registration data by law enforcement officials is not so "punitive" in form and effect as to render it unconstitutional punishment.

### b. *Community Notification*

■ Whether or not the public disclosure provision of Massachusetts's "Megan's Law" is unconstitutionally punitive is a far more difficult question. No federal courts appear to have addressed community notification provisions akin to Massachusetts's Level One dissemination scheme. Among those courts that have reviewed statutes authorizing Level Two- and Three-type notification, some have upheld community notification laws as nonpunitive, remedial measures, *see e.g., W.P. v. Poritz*, 931 F.Supp. 1199, 1211–1219 (D.N.J.1996); *Doe v. Poritz*, 142 N.J. 1, 110, 662 A.2d 367, 422 (1995); *People v. Afrika*, 168 Misc.2d 618, 625, 648 N.Y.S.2d 235, 241 (1996), while others have condemned such notification as constitutionally impermissible "punishment." *See e.g., Doe v. Pataki*, 940 F.Supp. 603, 629 (S.D.N.Y.1996); *Roe v. Office of Adult Probation, et al.*, 938 F.Supp. 1080, 1091 (D.Conn.1996); *State v. Myers*, 260 Kan. 669, 701–702, 923 P.2d 1024, 1044 (1996). Even when courts review the same or substantially similar notification laws, there is no consensus as to whether state-sponsored community notification "punishes" the offenders that it exposes. *Compare Artway v. Attorney Gen. of N.J.*, 876 F.Supp. 666, 688–92 (D.N.J.1995) (deeming notification under New Jersey's law punitive) *with Doe v. Poritz*, 142 N.J. 1, 73–75, 662 A.2d 367 (1995) (finding notification under New Jersey's law nonpunitive).

For the following reasons, I conclude that the public disclosure scheme that currently is applicable to Level One juveniles under Mas-

sachusetts's "Megan's Law" is not so punitive in form and effect that it cannot legitimately be considered remedial.

■ First, under the Act as it currently exists, access to data regarding the Level One juvenile offender is carefully circumscribed. Only those persons who are over eighteen, who come to the police station or Board in person offering verification of their age and identity, and who sign a "record of inquiry" stating that the information is for their personal protection or the protection of a child are privy to registration information. *See* Mass.G.L. c. 6, § 178I, and § 178J(a).[6] The earlier legislation permitting general telephonic inquiries has been dropped.

Moreover, the statute appears to take the most restrictive approach to the distribution of registry data. Vulnerable members of the public are given just enough information to allow them to take precautions against potential sex crimes, and they must sign a statement warning of criminal penalties for misuse of that information. *See* Mass.G.L. c. 6, § 178J(b) (providing that only the offender's name, home and work addresses, offense, personal characteristics and photo shall be released).

Plaintiff fairly argues that once the information is disclosed, its word-of-mouth flow can no longer be controlled, and a juvenile, particularly in a small community, may be forced to live under the stigma of his prior offense. Although the sex offender label is not branded on an offender's forehead, under "Megan's Law," it may cast a shadow over him. Nevertheless, plaintiff has offered no

evidence that notification procedures akin to Level One public disclosure will have substantial, tangible punitive effects on those juvenile sex offenders whose criminal records are disclosed. *Compare Pataki*, 940 F.Supp. at 608–611 (considering ample anecdotal evidence from other jurisdictions that aggressive notification by law enforcement officials leads to an inappropriately punitive community response) *with Artway*, 81 F.3d at 1267 (3rd Cir.1996) (finding that plaintiff, who bears burden of proof, "presents no evidence in this record of dire consequences flowing from registration"). Unlike other state laws that appear to encourage the discretionary dissemination of registration information, *see Doe v. Pataki*, 940 F.Supp. at 624 (New York), Level One notification as set forth in Massachusetts's "Megan's Law" is achieved only when concerned community members personally seek information for the protection of themselves and their children. With Level One disclosure, no community response is expected and, perhaps more importantly, none is legally permitted. *Cf. People v. Afrika*, 168 Misc.2d 618, 624, 648 N.Y.S.2d 235, 240 (1996) (noting that, unlike modern community notification laws, "[t]he shaming punishments of colonial times were intended to and did visit society's wrath directly upon the offender").

Plaintiff Doe urges that Level One notification "punishes" juveniles more than adults, whose records of conviction are already public, because it *retroactively* strips them of the cloak of anonymity that the juvenile laws have historically conveyed. The fact that "Megan's Law" applies retroactively to juve-

---

6. One court has interpreted "Megan's Law" to establish a separate, truncated procedure whereby an adult member of the public can get a report from the Board concerning the sex offender status of an identified person solely upon verification of the inquirer's name and age. *See Doe v. Attorney Gen., et al*, Nos. 96–1349 and 96–1450 (Mass.Sup.Ct.1996) (Sweeney, J.) (unpublished opinion). While the interplay between sections 178I and 178J is unclear, I read the two provisions in tandem: section I describes generally the report that the Board must produce, and section J sets forth the procedure that one must follow to receive the requested registration information. Because the statutory text as a whole suggests that the dissemination of information to the public is triggered by the signing of a "record of inquiry" in the manner set forth in section

178J, I find that, a person who requests sex offender registration information from either the Board or the police must follow the specific procedures set forth by the legislature in G.L. c. 6, § 178J. The legislative history supports this conclusion. *See* H.R. 5949, at § 174A(7) (Ma. 1996); S. 2359, at § 174B9(a)(3) (Ma.1996). In any event, given the ambiguity, I construe the statute in a manner that is consistent with its constitutional validity. *See Knights Templars' & Masons' Life Indemnity Comp. v. Jarman*, 187 U.S. 197, 205, 23 S.Ct. 108, 111, 47 L.Ed. 139 (1902) ("[T]he cardinal rule of [statutory] construction [is] that where the language of an act will bear two interpretations, equally obvious, that one which is clearly in accordance with the provisions of the Constitution is to be preferred").

niles who committed sex offenses for fifteen years prior to the law's passage and who have a low risk of reoffense is, indeed, the most troubling aspect of the legislative scheme. Although admittedly a closer question, and one to which no federal court has spoken, I conclude that Doe has not presented a likelihood of success on the merits of his argument that juveniles are "punished" by public availability of their otherwise confidential information under the constitutional test. *See News Group of Boston, Inc. v. Commonwealth,* 409 Mass. 627, 631, 568 N.E.2d 600, 603 (1991) ("The opening of a Juvenile Court proceeding to the public, thereby possibly stigmatizing the juvenile, is not . . . a punishment in a constitutional sense."); *People v. Afrika,* 168 Misc.2d 618, 625, 648 N.Y.S.2d 235, 240 (1996) (citations omitted) (Our jurisprudence is replete with decisional law sustaining the imposition of new disabilities or requirements, some of which are severe, on those previously convicted of criminal acts where the legislation's overall design and effect is nonpunitive. . . .). The Level One notification scheme is rationally connected to the salutary purpose of permitting vulnerable community members to protect themselves from low risk sexual offenders, and the statutory approach appears to be among the least restrictive means of achieving this legislative goal, short of no public disclosure at all. Even though public disclosure of registration information will affect juveniles whose identities were formerly protected more acutely than adults whose criminal acts were always a matter of public record, I find that the minimal Level One public disclosure does not carry such a "sting" that it should be deemed "punishment." *See W.P. v. Poritz,* 931 F.Supp. 1199, 1218 (D.N.J.1996) (noting that "[w]hether the sting [of punishment] is great enough . . . is a matter of degree" (internal quotation marks and citations omitted)).

Because Massachusetts's "Megan's Law" is not likely to be considered punitive as applied to Level One juvenile sex offenders, the plaintiff is unlikely to prevail on his claim that the registration and notification to which he is presumably subject violates the Ex Post Facto, Bill of Attainder, and Double Jeopardy clauses of the United States Constitution.

### E. *Likelihood of Success—Other Challenges*

#### 1. *Cruel and Unusual Punishment*

■ Plaintiff asserts that "Megan's Law" as applied to juveniles amounts to cruel and unusual punishment in violation of the Eighth Amendment. Having determined that the Act is unlikely to be deemed "punishment" as it applies to Level One juvenile sex offenders, plaintiff Doe has no likelihood of prevailing on his claims that such an application violates the Eighth Amendment prohibition against cruel and unusual punishment. *See e.g., People v. Adams,* 144 Ill.2d 381, 389, 163 Ill.Dec. 483, 487, 581 N.E.2d 637, 641 (1991) (finding that sex offender registration is not punishment and, thus, cannot violate the Eighth Amendment).

#### 2. *Equal Protection*

■ Plaintiff also claims that applying Megan's Law to juvenile sex offenders "will effectively single out a discrete group and treat them differently than similarly situated juvenile offenders." *Plaintiff's Memo. in Support of Prelim. Injunction,* at 7. Because juvenile sex offenders are not in a suspect or quasi-suspect class and fundamental rights are not implicated, the legislature need only have a rational basis for distinguishing them from other juveniles in order to survive the equal protection challenge. *See Beauchamp v. Murphy,* 37 F.3d 700, 707 (1st Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1365, 131 L.Ed.2d 221 (1995); *Cameron v. Walsh,* 1996 WL 461502, *5 (D.Mass.1996). The basis for treating juveniles who commit sex crimes differently from other juvenile offenders is rational: the legislature determined that sex offenders pose a higher danger of recidivism than other offenders, and that disparate treatment is needed to promote public safety. *Cf. Peterson v. Gaughan,* 404 F.2d 1375, 1377–78 (1st Cir.1968) (rejecting argument that there is no rational basis for treating sexually dangerous persons differently).[7]

---

7. As plaintiff Doe pled guilty to four counts of indecent assault and battery on a child under

### 3.  Procedural Due Process

■ Because the Act does not afford a procedure by which a Level One juvenile offender can challenge disclosure of his registration information, the plaintiff argues that "Megan's Law" violates his Fourteenth Amendment right to Due Process. The defendants respond that plaintiff Doe has not indicated what individualized determination need be made in his case, and that his due process challenge is nothing more than an attack on the general legislative decision to subject sex offenders to registration and community notification. I agree. All sex offenders as defined by the statute are subject to at least Level One public disclosure. As a matter of law, the Board has no discretion to determine which sex offenders will be exposed to Level One notification and which will not; thus, a hearing for the Level One offender would serve no purpose. *See Bi–Metallic Investment Comp. v. State Board of Equalization,* 239 U.S. 441, 445, 36 S.Ct. 141, 142, 60 L.Ed. 372 (1915) ("General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule."). The Court has no occasion to address whether the due process protections available to Level Two and Three offenders are adequate.

### 4.  State Law

■ Plaintiff argues that Massachusetts's "Megan's Law" also violates his Ex Post Facto, Bill of Attainder, Due Process, and

Equal Protection rights under the Massachusetts Declaration of Rights. Because the Supreme Judicial Court has found that federal law guides state constitutional claims in regard to these provisions, *see, e.g., Sheridan v. Gardner,* 347 Mass. 8, 14–15, 196 N.E.2d 303, 308–309 (1964) (Bill of Attainder and Ex Post Facto); *Dickerson v. Attorney Gen.,* 396 Mass. 740, 743, 488 N.E.2d 757 (1986) (Equal Protection); *Carleton v. Framingham,* 418 Mass. 623, 630, 640 N.E.2d 452 (1994) (Due Process), the plaintiff has no greater likelihood of success on his state constitutional law claims than on his federal ones.

Moreover, in a recent advisory opinion, the Supreme Judicial Court reviewed the bill that eventually became "Megan's Law," and found that, because the community notification provisions of the Act were not "punishment," the proposed legislation did not violate the Double Jeopardy Clause of the United States Constitution or the Ex Post Facto or clauses of the federal and state constitutions. *See Opinion of the Justices,* 423 Mass. 1201, 1224–28, 1240–42, 668 N.E.2d 738, 750–753, 759–761.[8] Even though the Justices conducted only a limited review of the community notification portion of the bill, their analysis strongly suggests that registration, which is less burdensome in fact, is also not likely to be deemed a "punitive" measure for the purposes of state constitutional law. I conclude that Doe has little likelihood of success on the merits of his claim that the Act violates the Massachusetts Declaration of Rights. *See Opinion of the Justices,* 423 Mass. at 1237, 1242, 668 N.E.2d 738 (answering "no" to question of whether Act violates state equal protection or due process as well).[9]

fourteen, *see* G.L. c. 265, § 13B, this Court makes no comment about the rationality of the legislative decision to require registration for other offenses, such as open and gross lewdness. *See* G.L. c. 6, § 178C (defining "sex offense" to include the crime of "open and gross lewdness and lascivious behavior").

**8.** The SJC considered Senate Bill No. 2276, a draft of the legislation that is substantially similar to the enacted law. One notable difference is that the earlier draft of the law created an explicit rebuttable presumption that a juvenile sexual offender should receive a Level one designation; another is that the bill contained a provision

permitting telephone inquiries. *See Opinion of the Justices,* 423 Mass. at 1208 n. 7, 668 N.E.2d 738; *see also Doe v. Attorney Gen. et al,* Nos. 96–1349 and 96–1450 (Mass.Sup.Ct.1996) (finding distinctions between the bill that the SJC reviewed and the enacted law).

**9.** As plaintiff Doe makes no separate claim challenging the legislature's recent amendments to the juvenile justice system, *see* H.B. No. 5876, c. 200, §§ 1 to 39 (1996), or questioning the interplay between these new statutes and "Megan's Law," I do not address these issues.

### 5. *Res Judicata/Collateral Estoppel*

█ Finally, plaintiff is unlikely to be successful on the merits of his claim that "the defendants are estopped from imposing and enforcing a greater penalty" than was agreed to at the time of the plea. Cmplt. ¶ 30. Since registration and community notification is likely not "punitive" as it regards Level One juveniles, I agree with the Supreme Judicial Court that being subject to the Act is a collateral consequence of being adjudicated a juvenile sex offender and that "any failure to inform [a sex offender] would not violate the terms of the plea agreement." *Opinion of the Justices,* 423 Mass. 1201, 1231, 668 N.E.2d 738 (1996) (concluding that "notification provisions are 'but one of the many contingent consequences of being confined'" (quoting *Commonwealth v. Morrow,* 363 Mass. 601, 606, 296 N.E.2d 468 (1973))); *see also Doe v. Poritz,* 142 N.J. 1, 77 n. 18, 662 A.2d 367, 406 n. 18 (1995). Moreover, plaintiff's entering the guilty plea without knowledge of the potential for registration and community notification does not render his plea involuntary and, thus, does not violate the Constitution. *See United States v. Campusano,* 947 F.2d 1, 5 (1st Cir.1991) (holding that "the prosecution is only obligated to advise defendants of the direct consequences of a guilty plea"); *Cameron v. Walsh,* 1996 WL 461502, *3–*4 (D.Mass.1996) (finding commitment under Massachusetts's Sexually Dangerous Persons Act is a "collateral, contingent consequence" and that failure to inform defendant did not make plea constitutionally infirm); *see also Cuthrell v. Director, Patuxent Inst.,* 475 F.2d 1364, 1366 (4th Cir.1973) (rejecting contention that the failure to inform a juvenile delinquent that his guilty plea might result in civil commitment did not invalidate plea or commitment), *cert denied,* 414 U.S. 1005, 94 S.Ct. 362, 38 L.Ed.2d 241 (1973).

### F. *Remaining Preliminary Injunction Factors*

Because plaintiff has little likelihood of succeeding on the merits of his claims under the current state of the law, it is unnecessary to proceed to a discussion of the nature of the harm, the balance of the equities, or the effect on the public interest from a grant or a denial of the injunction. *See, e.g., LeBeau v. Spirito,* 703 F.2d 639, 645 (1st Cir.1983).

### *ORDER*

For the foregoing reasons, plaintiff's motion for preliminary injunction is ***DENIED.***