John ROE, Plaintiff,

v.

Winthrop FARWELL, Commissioner, Department of Public Safety; Craig Burlingame, Executive Director, Criminal History Systems Board; Kathleen O'Toole, Secretary, Executive Office of Public Safety and Chairwoman, Sex Offender Registry Board; John F. Hollow, Chief of Police, Lynn, Defendants.

No. Civ.A. 97–10715–WGY.

United States District Court, D. Massachusetts.

March 31, 1998.

William B. VanLonkhuyzen, Zalkind, Sheketoff, Wilson, Homan, Rodriguez & Lunt, Boston, MA, for John Roe, plaintiff.

Loretta M. Smith, Attorney General's Office, Boston, MA, George S. Markopoulos, Lynn, MA, for Defendants.

*MEMORANDUM AND ORDER*

YOUNG, District Judge.

## I. INTRODUCTION

This case presents to this Court questions faced in many jurisdictions across this country regarding the constitutionality of sex offender registration and notification statutes commonly referred to as "Megan's Laws" after seven year old Megan Kanka of New Jersey who was abducted, raped, and mur-

dered on July 29, 1994 by a neighbor who lived across the street and was a released sex offender previously convicted of sex offenses against young girls. Neither Megan's parents, neighbors, nor the local police department knew about this sex offender's presence in their community. In response to this tragedy, the New Jersey legislature passed the Sex Offender Registration and Community Notification Acts on October 31, 1994. Spurred, in part, by the tragedy of Megan Kanka and other children at the hands of known sex offenders, the remaining states, including Massachusetts, soon enacted their own version of Megan's Law.[1]

The case presently before this Court seeks a declaratory judgment that the Massachusetts Megan's Law, Mass.Gen. Laws ch. 6 §§ 178C–178P, is unconstitutional on its face and as applied to the plaintiff John Roe[2] ("Roe") in that it violates the terms of his plea agreement, as well as the Ex Post Facto, Double Jeopardy, Cruel and Unusual Punishment, Bill of Attainder, Equal Protection, and Due Process Clauses of the United States Constitution. Roe sought a preliminary injunction and this Court combined the hearing thereon with trial on the merits. Fed.R.Civ.P. 65(a)(2). Trial on a statement of agreed facts, see *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.*, 972 F.2d 426, 430 n. 7 (1st Cir.1992), was held on July 2, 1997.

## II. STATUTORY SCHEME

The Massachusetts legislature enacted the Massachusetts Sex Offender Registration and Community Notification Act ("the Act")

on July 31, 1996. It became effective on October 1, 1996. The Act amended Mass. Gen. Laws ch. 6 by adding sections 178C to 178O.[3] These new sections impose registration and notification requirements on "sex offenders." Under the statute, a sex offender is "a person convicted of a sex offense . . . on or after August first, nineteen hundred and eighty-one." Mass.Gen. Laws ch. 6, § 178C. The Act defines eleven crimes as sex offenses, along with attempt to commit any of the listed sex offenses and violation of similar crimes in other states.

The Act requires that all sex offenders residing in Massachusetts register in person with their local police department. Mass. Gen. Laws. ch. 6, § 178E(h). The police department submits the registration data to the Criminal History Systems Board who sends such data to the police departments where the sex offender intends to live and work, to the police department where the offense was committed, and to the Federal Bureau of Investigation. Mass.Gen. Laws ch. 6, § 178(K)(2). A sex offender must notify the police department where he or she is registered of any change in his or her residential or work address five days prior to establishing a new residence. Mass.Gen. Laws ch. 6, § 178E(e) & (f). Failure to register is a misdemeanor punishable by two and one-half years in a house of correction or by a fine of not more than one thousand dollars or both. Mass.Gen. Laws ch. 6, § 178H.

The Act establishes an annual procedure for the verification of the registration data that includes an in-person appearance by the

**1.** Congress's enactment of the Jacob Wetterling Act, Pub.L. No. 103–322, Title XVII, § 170101, 108 Stat.2038 (1994), was another impetus to the states enactment of their own Megan's Law. Enacted on September 13, 1994 as part of the Violent Crime Control and Law Enforcement Act, the federal Megan's Law encourages states to enact sex offender registration and community notification laws in order to maintain the level of federal funding for crime control. *See* 42 U.S.C. § 14071(g)(2)(A). At the time of the enactment of New Jersey's Megan's Law and the Jacob Wetterling Act about one-half of the states had similar sex offender registration and community notification laws. *See* Caroline Louise Lewis, *The Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act*, 31

Harv.C.R.–C.L.L.Rev. 89, 90 n. 7 (1996). Presently, all fifty states have some type of sex offender registration or community notification laws.

**2.** John Roe is a pseudonym. Roe's motion to file this action under pseudonym was allowed by the Court's Order of April 23, 1997. (Docket No. 3).

**3.** On September 30, 1997, the Massachusetts legislature further amended Mass.Gen. Laws ch. 6 by adding section 178P, authorizing a police officer to arrest a sex offender where the officer has probable cause to believe that the sex offender has failed to comply with the registration requirements of the Act.1997 Mass.Legis.Serv. 529.

sex offender at his or her local police department. Mass.Gen. Laws ch. 6, § 178F. The annual registration requirement terminates "twenty years after the sex offender has been convicted or adjudicated or has been released from all custody or supervision, whichever last occurs, unless the sex offender was convicted of two or more sex offenses committed on different occasions, in which case the duty to register shall last for the offender's life." Mass.Gen. Laws ch. 6, § 178G. A sex offender may apply to have the registration obligation terminated upon a showing, by clear and convincing evidence, "that [he] has not committed a sex offense within fifteen years following conviction, adjudication, or release from all custody or supervision, whichever is later, and is not likely to pose a threat to the safety of others." Id.

Under the Act, the Criminal History Systems Board is responsible for establishing and maintaining a computerized sex offender registry. This registry is expected to contain a file on each sex offender including specified registration data.[4]

The Act establishes a Sex Offender Registry Board, a subdivision of the Criminal History Systems Board, responsible for 1) establishing guidelines for assessing the recidivism risk of sex offenders; 2) applying the guidelines to determining the risk level of a particular sex offender; 3) creating guidelines for police departments in distributing sex offender registry information; and 4) making recommendations to the Superior Court on a sex offender's recidivism level and community notification plan when an offender, who has a right to judicial review, has requested a hearing. Mass.Gen. Laws ch. 6, § 178K.[5] Pursuant to its regulatory authority under the Act, the Sex Offender Registry Board has pro-

mulgated guidelines both for assessing a sex offender's risk of recidivism, 803 C.M.R. § 1.02, and for a police department's dissemination of sex offender registry information. 803 C.M.R. § 1.03.

The Act establishes a three-tiered notification system based on a sex-offender's risk of recidivism. The greater the risk of recidivism, the greater the level of notification. Broader community notification is required where the risk of recidivism is moderate (level two) or high (level three). Where the risk is moderate, community notification of organizations "likely to encounter" the sex offender (e.g., schools, day care centers, religious and youth organizations, and sports leagues) is required. Mass.Gen. Laws ch. 6, § 178K(2)(b); 803 C.M.R. § 1.03(5). Where the risk is high, community notification of organizations "likely to encounter" the sex offender and individuals "likely to encounter" the sex offender is required. Mass.Gen. Laws ch. 6, § 178K(2)(c); 803 C.M.R. § 1.03(6).

Under the level-two community notification requirement, the local police department, where the sex offender resides or works, is required to provide the relevant community organizations with the sex offender's 1) name; 2) home and work address; 3) information about the sexual offense or offenses committed and the date of the conviction or convictions; 4) his or her age, sex, race, height, weight, eye and hair color; and 5) a photograph (hereinafter "sex offender registry information"). Under the level-three community notification requirement, extensive community notification is required. In addition to notifying organizations in the community which are "likely to encounter" the sex offender, the local police department is required to notify individual members of

---

4. The Act specifies that the registration data shall consist of the sex offender's name, aliases used, date and place of birth, sex, race, height, weight, eye and hair color, social security number, home address and work address, a photograph, a set of fingerprints, a description of the offense, the city or town where the offense occurred, the date of conviction, the sentence imposed, any other information that may be useful in assessing potential recidivism, and any other information that may be useful in identifying the sex offender. Mass.Gen. Laws ch. 6, § 178D.

5. The Act references section 178L as the statutory basis for the hearing. As promulgated, however, this section is blank. The only section dealing with a risk designation hearing is section 178M which permits a sex-offender who is given a level two or level three designation to challenge such designation through a hearing in the Superior Court.

the public who are "likely to encounter" the sex offender. Such notification is to occur by using local cable television stations, local newspapers, or the public posting of information. 803 C.M.R. § 1.03(6)(c). All notices to the community under the level-two or the level-three notification procedures are required to contain a criminal penalties warning against the use of sex offender registry information to commit a crime or to discriminate or harass a sex offender. Mass.Gen. Laws ch. 6, § 178K(2).

Another element of the public disclosure system established under the Act is public initiated access to sex offender registry information. Two provisions of the Act permit a person to request and obtain sex offender information. *See* Mass.Gen. Laws ch. 6, §§ 178I & 178J. Under Section 178I, any person who is eighteen years of age or older may request verification of whether a person is a sex offender, his or her sex offenses, and the date of his or her convictions from the Criminal History Systems Board.

Under section 178J, any person may inquire at a local police department about whether a sex offender resides or works in a particular geographic area or whether a specific person is a sex offender. Such inquiry must be for the purposes of protecting the inquirer or a minor child or other person in the inquirer's care, custody, or control. If a sex offender is identified, the police department will provide the inquirer with the sex offender registry information for the sex offender, including the sex offender's home address or work address, if such address is within a one mile radius of a specified geographic area or on a specified street. Mass. Gen. Laws ch. 6, § 178J(c)(ii) and (iii). Like the community notification notices, any report issued contains a criminal penalties warning for the illegal use of sex offender registry information. Mass.Gen. Laws ch. 6, § 178I.

## III. FACTS[6]

■ Roe is a resident of Lynn, Massachusetts. He owns a company which manufac-

tures porcelain dental fittings. Plt.'s Aff. ¶ 2. One of his employees was a thirty-three year old female. From the beginning of her employment with Roe, she was subjected to Roe's inappropriate touching, hugging, and attempts to kiss her. Mercurio Aff., Initial Police Report Narrative. When she informed Roe that she intended to leave her position because of his conduct, he threatened to kill her. *Id.* On February 11, 1990, when this employee was working late, Roe approached her and stated, "I feel whorish, and I'm going to make love to you." *Id.* When the employee rejected this unwanted advance, Roe grabbed her around the shoulders, tried to kiss her, and then forced her to a stairwell where he forcibly removed her pants, underpants, and shoes. *Id.* When the employee struggled in her attempts to protect herself, Roe put both hands around her neck and attempted to choke her, saying, "If you don't open your legs I'll kill you!" *Id.* He subjected her to vaginal penetration with his fingers and penis and performed cunnilingus on her. *Id.* Roe forced her to masturbate his penis. *Id.* Then, he·led her to a room with a cot and continued to rape her and to sodomize her. *Id.* This brutalization continued for one-and-a half to two hours. *Id.* At the end of this brutal attack, Roe threatened to kill her if she did not return to work the next day. ·*Id.*

A criminal complaint charging Roe with one count of assault and battery, three counts of rape, two counts of indecent assault, and one count of threats was filed against Roe. Mercurio Aff., Application for Complaint. Roe was tried and convicted on both the rape and indecent assault and battery charges. Plt.'s Aff. ¶ 2; Mercurio Aff. ¶ 3. He was sentenced to eight to fifteen years at MCI Cedar Junction. Following his conviction, the victim filed a civil suit against him.

In December 1991, after serving nine months of his sentence, Roe won a motion for a new trial. Prior to this trial, he entered

---

**6.** In a jury-waived case tried as was this upon a statement of agreed facts, the Court may draw any reasonable inference. *Continental Grain Co. v. Puerto Rico Maritime Shipping Auth.,* 972 F.2d 426, 430 n. 7 (1st Cir.1992) (citing *Boston Five Cents Savings Bank v. Secretary of the Dep't of Housing and Urban Dev.,* 768 F.2d 5, 11–12 [1st Cir.1985]). ·

into a conditional plea bargain agreeing to plead guilty to all of the criminal charges against him in exchange for a recommended sentence of time served, no probation, and a stipulation that Roe was not subject to the sanctions imposed by Massachusetts Sexually Dangerous Persons Act, Mass.Gen. Laws ch. 123A, § 1 *et seq.* Plt.'s Aff. Ex. A. Additionally, an agreement to dismiss the civil suit, based on Roe's guilty plea, was executed on November 6, 1992. Plt's. Aff. Ex. B. The Superior Court accepted Roe's plea bargain and on November 1992, he pled guilty to two counts of rape and three counts of indecent assault and battery. Plt.'s Aff. Ex. A; Mercurio Aff. ¶ 4. Based on the evidence in the record, Roe has no other criminal history.

Roe is a sex offender, as he was convicted of crimes constituting sex offenses under the Act. Therefore, he is subject to its registration and public disclosure requirements. To date, Roe has registered with his local police department, but he has not been given a risk-designation under the Act.

## IV. THE DECISIONAL FRAMEWORK

Since its enactment, the Massachusetts Supreme Judicial Court has issued two opinions addressing constitutional challenges to the Act. In *Doe v. Attorney General,* 425 Mass. 217, 680 N.E.2d 97 (1997), the Supreme Judicial Court upheld the issuance of a preliminary injunction enjoining the enforcement of section 178I, holding there was no explicit remedial purpose in the provision and that the potential harm to the plaintiff in his employment or community from the released information was substantial. In *Doe v. Attorney General,* 426 Mass. 136, 686 N.E.2d 1007 (1997), the court further concluded that under Article 12 of the Massachusetts Declaration of Rights procedural due process mandates that, prior to imposing a duty to register and subjecting a level-one sex offender to the notification provisions of this Act, a hearing is required to determine whether the offender poses a threat to minor children or other vulnerable persons and what, if any, information should be accessible to the public.

Prior to the enactment of this measure, the Massachusetts Senate had requested an advisory opinion from the Supreme Judicial Court as to the constitutionality of the community notification provisions of Senate Bill No. 2276. In *Opinion of the Justices to the Senate,* 423 Mass. 1201, 668 N.E.2d 738 (1996), the Supreme Judicial Court concluded that the proposed community notification provisions did not constitute constitutionally impermissible punishment under either the United States Constitution or the Massachusetts Constitution and, therefore, did not violate their Ex Post Facto, Cruel and Unusual Punishment, or Double Jeopardy Clauses, nor did the provisions violate a sex offender's right to due process and equal protection under the law. But, as has been noted by Justice Fried, the community notification provisions of Senate Bill No. 2276 are different from the Act as subsequently enacted. Senate Bill No. 2276 was "a more carefully calibrated statute." *Doe v. Attorney General,* 426 Mass. at 146, 686 N.E.2d 1007 (Fried, J., concurring).

There have been a number of Superior Court decisions on the constitutionality of the Act, but they have reached substantively different legal conclusions. *See Doe v. Attorney General,* No. 96–1450, (Hampden Super.Ct. Nov. 19, 1996) (Sweeney, J.) (issuing a preliminary injunction against the general request provisions of section 178I as applied to a level-one, adult sex-offender on the grounds that the provision was punitive), *aff'd,* 425 Mass. 217, 680 N.E.2d 97 (1997); *Doe v. Criminal History Systems,* No. 96–6046, 1997 WL 100878 (Middlesex Super.Ct. Feb. 25, 1997) (Neel, J.) (denying a preliminary injunction sought by a juvenile sex offender, who was deemed a delinquent child for raping a child under sixteen, as section 178I is not unconstitutional); *Doe v. Attorney General,* No. 96–02419 (Norfolk Super Ct. Apr. 14, 1997) (Cowin, J.) (holding that the registration and notification provisions of the Act are not punitive as applied to a juvenile sex offender and reading section 178I and 178J in tandem); *Doe v. Sex Offender Registry Board,* No. 97–571 (Middlesex Super.Ct. May 1, 1997) (Botsford, J.) (denying motion in limine to determine the scope and standard of review in a challenge to a sex offender risk designation and con-

cluding that the government bears the burden of proving at a pre-classification hearing that the board's classification is not in error, because the notification provisions implicate a liberty interest due to the reputational harm coupled with an adverse effect on employment). *Doe v. Sex Offender Registry Board*, No. 97–198 (Hampden Super.Ct. Aug. 1997) (Wernick, J.) (holding that the risk classification procedures of the Act deprive level-two and level-three sex offenders of liberty without due process of law in violation of the United States Constitution and the Massachusetts Constitution, and that section 178M and parts of section 178K are facially unconstitutional); *Doe v. Sex Offender Registry Board*, No. 97–2462, 1997 WL 819765 (Middlesex Super.Ct. Dec. 22, 1997) (Botsford, J.) (granting a preliminary injunction as to the application of community notification provisions to a level-three sex offender and concluding, based on the Supreme Judicial Court's opinion in *Doe v. Attorney General*, 426 Mass. 136, 686 N.E.2d 1007 (1997), that due process rights are violated where public disclosure takes place prior to a hearing on its necessity, and ruling that the post-classification hearing provided under section 178M is constitutionally insufficient).

One federal court has addressed the constitutionality of the Act. *Doe v. Weld*, 954 F.Supp. 425 (D.Mass.1996) (Saris, J.) In that case, the court denied a preliminary injunction to a juvenile sex offender who challenged the constitutionality of the Act under the Ex Post Facto, Double Jeopardy, Bill of Attainder, Cruel and Unusual Punishment, and Equal Protection Clauses of the United States Constitution. The court held that registration and community notification under the Act do not constitute punishment for the purposes of the Ex Post Facto, Bill of Attainder, and Double Jeopardy Clauses. The court relied in part upon a construction of the Act that read sections 178I and 178J in tandem to impose the procedural requirements of section 178J on inquiries made under section 178I. Under this interpretation, the court concluded that public access to registration data was carefully circumscribed so that the punitive effects did not outweigh the remedial purpose of the provisions.

The interpretation given the Act by the Massachusetts Supreme Judicial Court is, of course, binding on this Court, as is that court's interpretation of the Massachusetts Constitution. Moreover, while this Court normally would follow the carefully reasoned approach of a colleague in this District, the facts and circumstances raised by Roe in this case are substantively different from those raised by the plaintiff in *Doe v. Weld*. Furthermore, the Supreme Judicial Court's opinion in *Doe v. Attorney General* appears to reject the statutory construction given to section 178I by *Weld*. "If the Legislature intended that the requirements of § 178J are to apply to an inquiry under § 178I, it is unclear why some but not all the requirements of § 178J are included in § 178I in substantially identical language." *Doe v. Attorney General*, 425 Mass. at 221 n. 6, 680 N.E.2d 97.

While only the Supreme Judicial Court's interpretations of the Act are binding on this Court, the provisions of New York and New Jersey's Megan's Laws are similar to the those of the Massachusetts Act and have been the subject of careful and rigorous constitutional analysis by the respective federal and state courts in those jurisdictions. The decisions of those courts are referred to herein where useful in this analysis. *See Doe v. Pataki*, 120 F.3d 1263 (2nd Cir.1997); *E.B v. Verniero*, 119 F.3d 1077, (3rd Cir.1997), *cert. denied sub nom., W.P. v. Verniero*, —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105, *Verniero v. W.P.*, —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 2105 (1998); *Artway v. Attorney General*, 81 F.3d 1235 (3rd Cir. 1996); *Doe v. Poritz*, 142 N.J. 1, 662 A.2d 367 (1995). *See also* Recent Case, *Constitutional Law–Double Jeopardy and Ex Post Facto Clauses–Third Circuit Holds that Notification Requirement of Megan's Law Does Not Constitute Punishment*, 111 Harv.L.Rev. 1353 (1998) (criticizing *Verniero* ).

## V. PLAN OF ANALYSIS

The foregoing review of the statutory scheme, the background facts, and the decisional framework is necessary because Roe here mounts a broadside attack against the statute on its face and as applied to him

under the United States Constitution, attacking the registration requirements, the classification system, and the concomitant notification provisions. His factual record is, however, deficient. Due to his use of a pseudonym, it has not proved possible independently to verify various of the underlying significant facts. True, Roe fears classification as a level-three sex offender with its concomitant wide dissemination of his status. There is a reasonable likelihood of his being so classified given the threats of violence through which he repeatedly raped the victim and the bodily harm caused to her from the actual commission of the sex offense. *See* 803 C.M.R. § 1.02(5)(c). Nevertheless, Roe has not yet been classified, it is not clear beyond peradventure that he will be unable to convince the Sex Offender Registry Board to reduce his initial classification and, in any event, he may[7] have a right to a pre-registration hearing. *Doe v. Attorney General,* 426 Mass. at 143, 686 N.E.2d 1007.

■ In the these circumstances, the Court declines to draw inferences concerning the course of administrative proceedings that have not yet—and may never—be held. Federal constitutional curbs upon a state's power to legislate to protect the safety and security of its people ought be imposed only upon a definitive record setting forth the precise conduct challenged, and then only after the protections of the state constitution have been exhausted. *Bellotti v. Baird,* 428 U.S. 132, 146–51, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). The Court is nonetheless cognizant of its duty to declare the rights of the parties upon the record before it. Therefore, to the extent that, after analysis, Roe's various challenges must fail under the United States Constitution, the Court will so declare. Where questions remain, the Court will defer any declaration pending a resolution of the administrative proceeding at the state level.

## VI. VIOLATION OF PLEA AGREEMENT

■ Roe argues that the registration requirement and the public disclosure provisions violate the terms of his plea agreement with the Commonwealth by imposing additional punishment beyond the plea agreement's terms. Under the terms of the plea agreement, in exchange for pleading guilty to all five counts of the criminal complaint, no term of probation was to be imposed and Roe was not to be subject to the sanctions provided in Mass.Gen. Laws ch. 123A, § 1 *et seq.* for sexually dangerous persons. Plt.'s Aff. ¶ 14 Roe's plea was conditional on the Superior Court's acceptance of its terms. *Id.* The Superior Court accepted the plea agreement, no term of probation was imposed, and no finding was made that Roe was a sexually dangerous person. Verified Complaint ¶ 11. Roe contends that this judgment was "tantamount to a finding of no danger of recidivism." Verified Complaint ¶ 30. This Court disagrees.

The due process protections of the United States Constitution require that a plea agreement be made voluntarily and intelligently. *Boykin v. Alabama,* 395 U.S. 238, 242–43, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969). A defendant thus must have an understanding of the charge and the consequences of the plea. *See Commonwealth v. Morrow,* 363 Mass. 601, 605, 296 N.E.2d 468 (1973) (citing *Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); *Huot v. Commonwealth,* 363 Mass. 91, 100–01, 292 N.E.2d 700 (1973)). The requirement that a defendant have an understanding of the consequences of a plea, however, extends only to direct consequences and not to collateral consequences. *See, e.g., Ortiz–Casanova v. United States,* 54 F.3d 764, 1995 WL 301734 at \*5 (1st Cir. May 18, 1995); *United States v. Campusano,* 947 F.2d 1, 5 (1st Cir.1991). A consequence is a direct consequence where it represents "a definite, immediate, and largely automatic effect on the range of a

---

**7.** The qualified language is necessary because *Doe v. Attorney General,* 426 Mass. 136, 686 N.E.2d 1007 (1997) involved a level-one offender and Roe may well be classified at a higher level. The Supreme Judicial Court has not yet directly spoken to the procedural due process rights of a higher level sex offender. *But see* Justice Bots-

ford's careful opinion in *Doe v. Sex Offender Registry Board,* No. 97–2462, 1997 WL 819765 (Middlesex Super.Ct. Dec. 22, 1997) (preliminarily enjoining the application of the Act's provisions to a level-three offender absent a pre-classification hearing).

defendant's punishment." *United States v. Bouthot*, 878 F.2d 1506, 1511 (1st Cir.1989) (quoting *Cuthrell v. Director of Patuxent Inst.*, 475 F.2d 1364, 1366 (1973)[4th Cir. 1973]). The registration provisions and public disclosure provisions of the Act are collateral consequences of Roe's plea and do not invalidate the plea agreement. *See, e.g., Doe v. Weld,* 954 F.Supp. at 438 (holding that application of the Act to a level-one juvenile sex offender did not violate his plea agreement); *State v. Ward,* 869 P.2d at 1074–76 (holding that registration under Washington's Megan's Law is a collateral consequence of a guilty plea and, therefore, there is no requirement to notify defendant of the duty to register prior to entry of the plea).

Here, the Superior Court's acceptance of the plea agreement merely suggests a conclusion by that Court that Roe's conduct was not "repetitive or compulsive sexual misconduct." *See In Re Redgate,* 417 Mass. 799, 804, 633 N.E.2d 380 (1994). The fact that the Superior Court did not find Roe to be a "sexually dangerous person" subject to the provisions of Mass.Gen. Laws ch. 123A, § 1 *et seq.* does not bar the Commonwealth from classifying Roe as a sex offender subject to the registration and notification provisions of the Act.

## VII. EX POST FACTO AND DOUBLE JEOPARDY ISSUES

### A. LEGAL STANDARD

■ The Ex Post Facto Clause of the United States Constitution prohibits the legislative enactment of a law which: "1) makes a prior action, which legal when done, criminal, and punishes such action; 2) aggravates a crime, or makes it greater than it was, when committed; 3) changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed; 4) alters the legal rules of evidence, and requires less, or different testimony than the law required at the time of the commission of the offense in order to convict the offender." *Calder v. Bull,* 3 U.S. 386, 390, 3 Dall. 386, 1 L.Ed. 648 (1798). Roe claims a violation of the Ex Post Facto Clause asserting that the Act "changes the punishment and inflicts a greater punishment, than the law annexed to

the crime, when committed." *Id.* The Ex Post Facto Clause applies only to criminal statutes. *See, e.g., Kansas v. Hendricks,* —— U.S. ——, 117 S.Ct. 2072, 2086, 138 L.Ed.2d 501 (1997) (citing *California Dep't of Corrections v. Morales,* 514 U.S. 499, 505, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995)). The Double Jeopardy Clause prohibits multiple punishments for the same offense. *United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 2139, 135 L.Ed.2d 549 (1996). For a violation of either the Ex Post Facto Clause or the Double Jeopardy Clause to exist, the registration or community notification requirements of the Act must be deemed "punishment." *Hendricks,* 117 S.Ct. at 2086; *Ursery,* 116 S.Ct. at 2139.

The Supreme Court doctrine on whether a civil sanction constitutes punishment has developed most substantively in the area of double jeopardy. *See, e.g., Hendricks,* 117 S.Ct. at 2085–86 (holding that a Kansas statute establishing a civil commitment procedure for sexually violent predator did not constitute a criminal proceeding and, therefore, involuntary commitment under the Act was not punitive); *Ursery,* 116 S.Ct. at 2142–43, 2147; *United States v. Ward,* 448 U.S. 242, 248–51, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). This punishment analysis also has been applied to assessing Ex Post Facto challenges. *See Hendricks,* 117 S.Ct. at 2086. The analytical matrix culled from these opinions does not produce a single standard, and the applicability of any such framework to sex offender registry provisions is blurry. Circuit Courts attempting to glean an applicable standard of analysis in the specific context of sex offender registry provisions have relied on the intent-effects test articulated by the Supreme Court in *Ward, Ursery,* and *Hendricks* to devise an analytical protocol for assessing whether registration or notification provisions constitute "punishment." *See Pataki,* 120 F.3d at 1274–75; *Verniero,* 119 F.3d at 1095–96; *Russell v. Gregoire,* 124 F.3d 1079 (9th Cir. 1997), *cert. denied, sub nom. Stearns v. Gregoire,* —— U.S. ——, 118 S.Ct. 1191, 140 L.Ed.2d 321 (1998); *Doe v. Weld,* 954 F.Supp. at 432; *see also Opinion of the Justices,* 423 Mass. at 1221–24, 668 N.E.2d

738 (using the intent-effects principles of *Ursery* to devise a three-part test for determining whether the community notification provisions of Senate Bill No. 2276 constitute punishment under the Ex Post Facto, Due Process, and Double Jeopardy Clauses).

*Ursery* delineates a two-part test for assessing whether a civil sanction constitutes "punishment" under the Double Jeopardy Clause. The first part of this inquiry is a determination of legislative intent. Indication of express remedial or nonpunitive intent will result in a conclusion that such a statute does not constitute punishment, unless the party challenging the statute can demonstrate by "the clearest of proof" that the purpose or effect of the statute is so great as to negate the remedial intent. *See Ursery,* 116 S.Ct. at 2148; *Hendricks,* 117 S.Ct. at 2082; *Ward,* 448 U.S. at 248–49.

In *Hendricks,* the Supreme Court held that a Kansas statute authorizing the civil commitment of violent sexual predators was constitutional as such commitment did not constitute punishment and, therefore, did not violate either the Ex Post Facto or the Double Jeopardy Clauses though enacted after the plaintiff committed his crimes and applied to plaintiff upon his release from prison. On its face, the statute indicated a legislative intent to protect the public from the potential harm presented by sexually violent predators. The Court held that the effect of the civil commitment scheme was not sufficiently punitive as to negate its remedial purpose.

> Where the State has "disavowed any punitive intent"; limited confinement to a small segment of particularly dangerous individuals; provided strict procedural safeguards; directed that confined persons be segregated from the general prison population and afforded the same status as others who have been civilly committed; recommended treatment if such is possible; and permitted immediate release upon a showing that the individual is no longer dangerous or mentally impaired, we cannot

say that it acted with punitive intent. We therefore hold that the Act does not establish criminal proceedings and that involuntary confinement pursuant to the Act is not punitive.

*Hendricks,* 117 S.Ct. at 2085.

Roe argues that this Court should apply the Supreme Court's analysis in *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) for assessing whether a civil sanction constitutes punishment. *See* Plt's. Mem.Supp. Declaratory J. at 4. Such a position ignores the Supreme Court's more recent decisions in *Ursery* and *Hendricks* and the law of this Circuit. In *Ursery,* the Supreme Court expressly stated that the holding of *Halper* was confined to the specific factual circumstances of the case where a civil penalty is imposed to compensate the government for the harm caused by the offender. In that instance, a sanction will constitute punishment if it is "overwhelmingly disproportionate to the damages ... caused." *Ursery,* 116 S.Ct. at 2144 (quoting *Halper,* 490 U.S. at 449–50). In *United States v. Stoller,* 78 F.3d 710 (1st Cir.1996), the First Circuit held that the *Halper* analysis does not apply to determining whether a non-monetary sanction violates the Double Jeopardy Clause. *See Stoller,* 78 F.3d at 717–18.

The sanction at issue in *Hendricks*—civil commitment of a sexually dangerous person following release from prison—is closely analogous to the Massachusetts requirement that a sex offender register with law enforcement and conform to community notification requirements.[8] Both sanctions attempt "to grapple with the problem of managing repeat sexual offenders" or the problem of recidivism. *Hendricks,* 117 S.Ct. at 2076. Therefore, in evaluating whether the registration and notification requirements constitute punishment, this Court employs the *Ursery–Hendricks* framework.

---

**8.** Similarly, the Supreme Judicial Court has declared that the constitutionality of Massachusetts procedures for the civil commitment of sexually dangerous persons supports a ruling that the community notification provisions outlined in Senate Bill No. 2276 do not violate the Due Process Clause of the United States Constitution. *Opinion of the Justices,* 423 Mass. at 1230–31, 668 N.E.2d 738.

## B. REGISTRATION PROVISIONS

### 1. Legislative Intent

█ The determination of "whether a particular statutorily defined penalty is civil or criminal is a matter of statutory construction." *Ward*, 448 U.S. at 248. On its face, the intent of the Massachusetts legislature in requiring sex offenders to register is to provide the appropriate officials with the necessary information to aide law enforcement in the prevention of sexual offenses and in the investigation of particular sexual offenses when they occur. The legislative history confirms this construction. In the initial bills proposed by both the State Senate and House of Representatives, which are the basis for the Act, the legislature stated that:

> The legislature further finds that law enforcement agencies' efforts to protect their communities, conduct investigations and quickly apprehend sex offenders are impaired by the lack of information about sex offenders who live within their jurisdiction ... Registration will provide law enforcement with additional information critical to preventing sexual victimization and to resolving incidents involving sexual abuse and exploitation promptly.

House Bill No. 5949 (Legislative Findings and Purpose) (Apr. 22, 1996); *see also* Senate Bill No. 2276 (Legislative Findings and Purpose) (Apr. 22, 1996). This intent is clearly remedial. Roe identifies no contrary legislative history.

### 2. Effects Do Not Negate the Remedial Intent

█ Despite the clear indication of remedial intent on the part of the legislature in its enactment of this Act, "where a party challenging the statute provides 'the clearest proof' that the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it 'civil,'" *Hendricks*, 117 S.Ct. at 2082 (quoting *Ward*, 448 U.S. at 248–49), the statutory scheme will be deemed to constitute punishment. In assessing whether the statutory scheme is sufficiently punitive in its purpose or effect, the Supreme Court has continued to acknowledge the utility of the seven factors delineated in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) [9], but also has continued to hold that these factors are neither exhaustive nor dispositive on the punishment inquiry. *See Ward*, 448 U.S. at 249; *Ursery*, 116 S.Ct. at 2149 (citing *Ward*). Federal and state courts have split on the applicability or continued viability of these factors to the Megan's Law context.[10] This Court disagrees

---

[9]. The *Mendoza–Martinez* factors require the consideration of whether the sanction 1) involves an affirmative disability or restraint; 2) has historically been regarded as a punishment; 3) comes into play only on a finding of scienter; 4) will promote the traditional aims of punishment—retribution and deterrence; 5) applies to behavior that is already a crime; 6) can be assigned a purpose other than punishment; and 7) appears excessive in relation to the alternative purpose assigned. *Mendoza–Martinez*, 372 U.S. at 168.

[10]. Despite courts adopting the *Ursery* framework in whole or as a starting point for devising their own analytical framework, there has not been uniform application of the *Mendoza–Martinez* factors. Some courts either have employed the factors without discussion or consider the factors a useful analytical checklist for determining punishment. *See Russell*, 124 F.3d at 1084, 1087 (applying some of the *Mendoza–Martinez* factors); *Pataki*, 120 F.3d at 1275–76 (discussing *Mendoza–Martinez* as providing an viable analytical framework for assessing whether the effects of Megan's Law are punitive); *State v. Ward*, 869 P.2d at 1068–69 (applying *Mendoza–Martinez* factors without discussion). Other courts, rejecting

their application to this circumstance, argue that the factors are applicable only to determine whether a proceeding is civil or criminal. *Artway v. Attorney General*, 81 F.3d at 1262–63 (holding that 1) the *Mendoza–Martinez* factors are only applicable to determining whether a proceeding is punitive and, thus, requires the procedural safeguards of the Fifth and Sixth Amendments and 2) the factors are too indeterminate to be analytically useful); *Doe v. Weld*, 954 F.Supp. at 432–33 (implied rejection of *Mendoza–Martinez* factors); *Opinion of the Justices*, 423 Mass. at 1222, 668 N.E.2d 738 (concluding that the Supreme Court's decision in *Ursery* established that the *Mendoza–Martinez* factors do not apply in the double jeopardy context and viewing the factors as unhelpful in the punishment analysis because no weight or prioritization is assigned to the factors); *Doe v. Poritz*, 662 A.2d at 399–404 (rejecting the use of the *Mendoza–Martinez* factors as a determinative test in assessing the punitive or regulatory character of a statute and ruling they are inapposite to ex post facto, double jeopardy, and cruel and unusual punishment cases).

Given their rejection of the *Mendoza–Martinez* factors, the Third Circuit and the Supreme Judi-

with those courts who have concluded that the *Mendoza–Martinez* factors are inapposite to the punishment inquiry concerning Megan's Laws. This Court concludes that the *Mendoza–Martinez* factors provide a useful analytical framework to the punishment analysis and, although not dispositive, are applicable to assess whether a statute is punitive or regulatory. This Court recognizes that because the Supreme Court has not assigned a weight or priority to any of these factors there is the potential for "unmanageable indefiniteness." *Opinion of the Justices,* 423 Mass. at 1222, 668 N.E.2d 738. Nonetheless, taking its cue from the Supreme Court, this Court rules that certain of the factors provide a most helpful analytical approach. In fact, both the punishment analyses devised by the Third Circuit and the Supreme Judicial Court consider two of the *Mendoza–Martinez* factors: historical analog and excessive adverse effects. *See Artway,* 81 F.3d at 1263; *Opinion of the Justices,* 423 Mass. at 1224, 668 N.E.2d 738.

### 3. Application of the *Mendoza–Martinez* Factors

In an attempt to meet his heavy burden under the effects test, Roe evaluates the registration provisions using the *Mendoza–Martinez* factors. Although this Court disagrees with Roe's implied argument that these factors are dispositive or that all factors are relevant, it considers some of these arguments to show that Roe has failed to demonstrate by the "clearest proof" that the purpose or effect of the statute is so great as to negate the remedial intent.

#### a. Affirmative Disability or Restraint

Roe avers that the registration requirements of the Act are an affirmative disability or restraint because they impose an annual verification procedure and potentially subject sex offenders to police interrogations or line-ups. This Court disagrees. The physical act of registering is not an affirmative disability or restraint. The registration requirements do not affirmatively disable or restrain a sex offender's choice of residence, movement within the state or out of the state, or activities. *See, e.g., State v. Ward,* 869 P.2d at 1069 (upholding registration provisions similar to this Act); *Pataki,* 120 F.3d at 1286 (duty of a sexually violent predator to register every ninety-days for at least ten years was not a significant enough burden to make the registration requirements of the New York's Megan's Law punitive). The registration requirements do not prevent a sex offender from holding or pursuing a particular profession. *See Cummings v. Missouri,* 4 Wall. 277, 71 U.S. 277, 18 L.Ed. 356 (1866) (striking down as unconstitutional punishment a post-Civil War state constitutional provision barring from the certain professions any person who was unable to swear that they never had any sympathy of support for the Confederacy); *Ex Parte Gartland,* 4 Wall. 333, 71 U.S. 333, 18 L.Ed. 366 (1866) (same).

#### b. Historically Regarded as a Punishment

Despite Roe's arguments to the contrary, "registration is typically and historically a regulatory measure." *Russell,* 124 F.3d at 1089. *See generally, Lambert v. California,* 355 U.S. 225, 229, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957) ("Registration laws are common and their range is wide. . . . Many such laws are akin to licensing statutes in that they pertain

---

cial Court have devised a modified intent-effects tests. In *Artway,* the Third Circuit established a three-part analytical framework. *Artway,* 81 F.3d at 1263. The *Artway* standard is a three-prong analysis: 1) actual purpose, 2) objective purpose, and 3) effect. *Verniero,* 119 F.3d at 1093 (citing *Artway,* 81 F.3d at 1263). The actual purpose prong is an inquiry into the legislative intent. The second prong of the analysis, objective purpose, has three components: 1) the means-ends analysis, i.e., is the means reasonably related to the remedial goal; 2) historical analogues analysis; 3) mixed measures or proportionality analysis, i.e., does the deterrent purpose outweigh the remedial purpose. The third prong of the analysis, effect, asks whether the " 'sting' of a measure is so harsh 'as a matter of degree' that it constitutes 'punishment.' " *Verniero* at 1093 (quoting *Artway,* 81 F.3d at 1266). The second and third prongs of the Artway standard provide a concrete analytical framework for conducting the second part of the *Ursery* test. The Supreme Judicial Court rejected the *Artway* standard and, instead, crafted its own three-part test. *Opinion of the Justices,* 423 Mass. at 1222–24, 668 N.E.2d 738. This test considers 1) intent; 2) effect; 3) similarity to firmly established regulatory or criminal measures.

to the regulation of business activities."); Licia A. Esposito, J.D., *State statutes or ordinances requiring persons previously convicted of crime to register with authorities,* 36 A.L.R.5th 161 (1996) ("Criminal registration statutes and ordinances requiring persons convicted of certain crimes to register with local law enforcement or other governmental authorities have existed for years..."). The registration of sex offenders assists law enforcement in its criminal investigation of such offenses. *State v. Ward,* 869 P.2d at 1072. In this respect, felon registration provisions are a common nonpunitive device to assist law enforcement.

**c. Promotes Retribution and Deterrence**

Registration is not retributive but it does have a deterrent purpose. By requiring a sex offender to register, the legislature attempts to discourage recidivism by alerting the sex offender to the fact that he can easily be apprehended by law enforcement officials and is under the watchful eye of law enforcement. The fact that the Act serves a deterrent purpose does not affirmatively establish that it is punitive. As the Supreme Court has recognized, deterrence "may serve civil as well as criminal goals." *Ursery,* 116 S.Ct. at 2149.

**d. Legitimate Purpose**

Registration ensures that law enforcement has sufficient information on sex offenders to assist them in criminal investigations, apprehensions, and prosecutions. Presently, most of the information is available in the criminal history records maintained by the Criminal History Systems Board. *See* Mass.Gen. Laws ch. 6, § 167 to 178B (establishing a criminal record information system and process for information dissemination). The registration requirements make such information more readily available to law enforcement not for the purposes of harassment, as Roe contends, but to promote public safety and efficacious law enforcement. There is no evidence that the registration provisions will result in any other outcome.

**e. Excessiveness Beyond Legitimate Purpose**

Although a sex offender is unable to terminate his or her duty to register until at least fifteen years after his or her conviction or release from prison, this effect alone does not amount to the "clearest proof" required to cause a statute with a clear remedial purpose to be deemed punitive. *Cf. Hendricks,* 117 S.Ct. at 2083 (holding that confinement of a sexually violent predator for a potentially indefinite duration was not punitive where there was a reasonable nexus between the detention and the remedial objective). By compelling the registration of sex offenders, the legislature is reasonably advancing its law enforcement and public safety objectives.

In support of his position that the registration provisions of the Act are punitive, Roe relies on the California Supreme Court's decision *In re Reed,* 33 Cal.3d 914, 191 Cal. Rptr. 658, 663 P.2d 216 (1983). In that case, the court held that a mandatory sex offender registration statute inflicts punishment and violates the California constitution's prohibition against cruel and unusual punishment where the sex offender has committed a misdemeanor as such registration constitutes punishment. The court applied the *Mendoza–Martinez* factors and determined the registration provision to be punitive. A central part of the court's reasoning was its proportionality analysis where it determined that the punishment of registration far exceeded the actual offense and was treated more severely than more serious sex-related crimes or other serious crimes. The plaintiff's offense was a misdemeanor involving the solicitation of a police officer by the plaintiff in a public restroom which the court characterized as a "relatively simple sexual indiscretion." *Id.* 663 P.2d at 221. In the court's opinion, the plaintiff did not represent the type of person who the legislature intended to be subjected to the registration requirements in order to assist law enforcement efforts. In addition, the court found that several more serious sex-related misdemeanors were not subject to registration, including prostitution. Thus, the Court concluded that the punishment was not in proportion to

the crime and constituted cruel and unusual punishment under state law.

This case is readily distinguishable from *In re Reed*. First, the specific crimes listed as sex offenses under Mass.Gen. Laws ch. 6, § 178C are felonies. *See* Mass.Gen. Laws ch. 274, § 1. More importantly, the crimes for which Roe was convicted are felonies. Secondly, the constitutional issue in *In re Reed* was whether the sex offender registry provision violated the cruel or unusual punishment provisions of the California constitution. The *Reed* court focused not on the punishment aspect of the provision but on the proportionality inquiry in determining that the statute constituted cruel or unusual punishment as applied to the plaintiff, a misdemeanor sex-offender. *See In re Reed*, 191 Cal.Rptr. 658, 663 P.2d at 220–22. The reasoning of the Reed court is not apposite to the facts of this case.

Finally, in applying this Act's registration provisions to a juvenile offender, one of my colleagues concluded that "collection and use of juvenile offenders' registration data by law enforcement officials is not so 'punitive' in form and effect as to render it unconstitutional punishment." *Doe v. Weld*, 954 F.Supp. at 434. "[R]egistration provisions have overwhelmingly been sustained as constitutional by other courts." *Russell*, 124 F.3d at 1089 (listing cases).

This Court concurs. The registration provisions of the Act do not constitute punishment in violation of either the Ex Post Facto or Double Jeopardy Clauses. This conclusion is tempered by the recognition that, unlike some Megan's Laws, this Act does not permit a sex offender to challenge his duty to register. *See* N.Y. Correct. Law § 168–o; Wash.Rev.Code 9A.44.140(3). Indeed, at least three justices of the Supreme Judicial Court view registration as "a continuing, instrusive, humiliating regulation of the person himself." *Doe v. Attorney General*, 426 Mass. at 149, 686 N.E.2d 1007 (Fried, J., concurring, with whom Abrams and Marshall, JJ., join). Even so, this is not enough to render the registration provisions punishment under the Constitution of the United States.

## C. PUBLIC DISCLOSURE PROVISIONS

Roe avers that the community notification and public access provisions of the Act, i.e. §§ 178I, 178J and 178K, are punitive because such public disclosure 1) is historically punishment; 2) serves the traditional goals of punishment; 3) is an affirmative disability and restraint due to the effect of public stigma towards him as a sex offender on his personal life and professional life; 4) is an affirmative disability and restraint due to the greater disclosure of information on Roe than is available through judicial proceedings or criminal records; 5) is conducted under a punitive scheme; 6) results in excessively harsh effects on sex offender, i.e., threats and harassment; and 7) is too broad permitting disclosure to persons who are not vulnerable to or threatened by Roe's presence in their community.

### 1. Legislative Intent

In reviewing the legislative history of the Act, it is apparent that the legislature believed that public disclosure or notification was a central element in advancing the public safety objectives of the Act. In the initial bills, the legislature stated that:

> In balancing offenders' rights with the interest of public security, the legislature finds that releasing information about sex offenders to law enforcement agencies and, under certain circumstances, to the public will further the primary governmental interest of protecting children and other vulnerable populations from potential harm.

Senate Bill No. 2276 and House Bill No. 5949.

In *Opinion of the Justices*, the Supreme Judicial Court concluded that the community notification provisions of Senate Bill No. 2276 had a remedial purpose. The court characterized this purpose as:

> a purpose to provide community notification only where notification will allow particular members of the public who are in an especially vulnerable situation (or are responsible for the care of persons, like children, who are in an especially vulnerable situation) to take measures lawfully available to them to protect themselves

against danger. Such a purpose is plainly regulatory in that it seeks to prevent harm. Some members of the community who are provided with the notification may visit retributive consequences on the offender, but it is not the purpose of the legislation to produce that effect.

*Opinion of the Justices,* 423 Mass. at 1226–27, 668 N.E.2d 738. This conclusion has led some Justices of the Massachusetts Superior Court to conclude that the public disclosure provisions of the Act do not constitute punishment, claiming that the changes in the community notification provisions from Senate Bill No. 2276 to the Act are immaterial. *See Doe v. Attorney General,* No. 96–1450 at 6 (community notification provisions are identical to Senate Bill No. 2276 and, therefore, not punitive); *Doe v. Sex Offender Registry Board,* No. 97–198 at 15 n. 7 (finding community notification provisions "not materially different from those ultimately enacted.").

This conclusion is open to question. First, Senate Bill No. 2276 did not contain the public access provisions of sections 178I and 178J, which greatly expand the scope of public disclosure including public access to sex offender registry information concerning level-one sex offenders, nor did the Supreme Judicial Court consider the sex-offender telephone information line under which information similar to the information disclosed under these public access provisions would be released.[11] Second, the Supreme Judicial Court, as yet, has had no opportunity to evaluate the Sex Offender Registry Board's guidelines for the dissemination of sex offender registry information, as they had not been promulgated at the time of the *Opinion of the Justices.* Third, the community notification provisions of Senate Bill No. 2276 did not require the mandatory dissemination of the sex offender registry information nor disclosure of the sex offender's home address or work address.[12]

Lastly, the Supreme Judicial Court did not conduct an effects inquiry, because in responding to the Massachusetts Legislature on the single occasion when it spoke directly to the community notification provisions, it was not considering the application of the community notification provisions to a particular offender. As to the community notification provisions it considered, the Supreme Judicial Court opined that such provisions were "not overwhelmingly disproportionate to their remedial purpose of giving society the information necessary to protect itself from the harm caused by recidivistic offenders." *Opinion of the Justices,* 423 Mass. at 1241, 668 N.E.2d 738. The question here presented is whether a similar ruling ought be made as to the community notification and public access provisions of the Act as passed.

### a. Historically Punishment

Roe argues that public disclosure of his sex offenses is punitive, as such disclosure is analogous to the wearing of a "Scarlet Letter." Contrary to Roe's contention, the Third Circuit, as well as other federal courts addressing this issue, have rejected the his-

---

11. The public disclosure provisions of the Act reflect the reconciliation of opposing approaches to the release of sex offender registration information to the public. Each house initially rejected the public access provisions proposed by the other. The differences were reconciled in conference committee producing the terms and provisions of the present Act. The House believed that the public interest in knowing about the presence of sex offenders in a community far outweighed the sex offender's security and privacy interests. House Bill No. 5949. The Senate sought to impose more restrictive provisions upon the public access to sex offender registry information. Under the Senate's counterproposal to House Bill No. 5949, the release of such information required that the Criminal History Systems Board and local police departments determine that the release of information was nec-

essary to protect the public from a particular sex offender; that the information released was relevant; and that the person making the inquiry was 1) likely to encounter the sex offender and 2) had a reasonable suspicion that a person is at risk. Senate Bill No. 2358. These provisions are not fully reflected in the adoption of the sections 178I and 178J.

12. As to level-two and level-three sex offenders, the community notification provisions of Senate Bill No. 2276 stated that, "The police departments may disseminate relevant information including, but not limited to, the sex offender's name, photograph, the date and place of conviction and a description of the offense including modus of operation and the type of victim targeted." Senate Bill No. 2276.

torical punishment analogies. *Verniero,* 119 F.3d at 1099 ("Public shaming, humiliation, and banishment all involve more than the dissemination of information."); *see also, Pataki,* 120 F.3d at 1283 ("Stigmatization penalties of an earlier era primarily served distinctively punitive goals and operated through significantly different mechanisms than community notification pursuant to [the New York Sex Offender Registration Act]."); *Russell,* 124 F.3d at 1091–92 (considering "wanted" posters at least as apt an analogy as historical shaming punishments). The dissemination of information regarding criminal conduct, without more, is not punishment when done to advance a legitimate government purpose or objective. *See Verniero,* 119 F.3d at 1099–1100. The more apt analogy to the public disclosure of sex offender registry information is "the required dissemination of information generated by our criminal justice system and the subsequent dissemination of 'rap sheet' information to regulatory agencies, bar associations, prospective employers and interested members of the public." *Verniero,* 119 F.3d at 1100. *Cf.* Mass.Gen. Laws. ch. 6, § 168A–174 (dealing with the compilation of criminal records and data to create a criminal offender record information and the procedure for the dissemination of such information). This Court agrees that historical shaming punishments are not identical to notification or public disclosure, in large part because historical shaming punishments entailed more than the dissemination of information. First, the intent of such punishment was punitive. Whipping, branding, stockading, banishment were the punishment for the offender's particular transgression. Notification, on the other hand, occurs after the sex offender has been punished. It is not a substitute for punishment. Second, such punishment "required the physical participation of the offender and typically required direct confrontation between the offender and members of the public." *Russell,* 124 F.3d at 1091. The purpose, method, and process of such punishment are completely different from public notification.

> [P]ublic notification pursuant to [New York's Sex Offender Registration Act] is not imposed either in lieu of incarceration or fines-our society's preferred modes of punishment-or as another component of the offender's criminal sentence. Rather the "burden" of notification is imposed only after the designated punishment has been served, and is intended to serve the goals of protecting the public and facilitating future law enforcement efforts.

*Pataki,* 120 F.3d at 1283–84.

### c. Traditional Goals of Punishment: Deterrence and Retribution

Roe avers that the dissemination of his address and identity will result in public ostracism. He asserts that such a consequence is an objective of the Act in order to deter future criminal conduct. As the deterrence of future criminal conduct is an objective of the Act, he argues that the Act is punitive. The Supreme Court has explicitly stated that deterrence "may serve civil as well as criminal goals." *Ursery,* 116 S.Ct. at 2149. The legislative history here demonstrates that the objective behind public disclosure of sex offender registry information was to "further the primary governmental interest of protecting children and other vulnerable populations from potential harm." House Bill No. 5949 and Senate Bill No. 2276. The goal of public notification is to reduce the likelihood of re-offense by a sexual offender by giving law enforcement necessary information to be aware of potential dangers, the public necessary information in order to take appropriate steps to minimize a harmful encounter with a sex offender, and to deter the sex offender from reoffending because of the increased likelihood of apprehension. This deterrence objective is insufficient to render the notification provisions punitive, as there are underlying legitimate governmental public security purposes.

Nothing in the legislative history of this Act indicates a retributive intent on the part of the legislature. The fact that as a result of the public disclosure provisions, Roe may be subject to physical threats, harassment, and may find his employment situation impaired does not constitute retribution on the part of the government. The Act specifically warns of criminal penalties for the misuse of sex offender registry information. *See* Mass.

Gen. Laws ch. 6, § 178N. Any person who uses sex offender registry information to commit a crime against a sex offender or to illegally discriminate or to harass a sex offender is guilty of a misdemeanor and is subject to a fine and imprisonment.

### d. Affirmative Disability or Restraint

#### 1) *Effects on Personal and Professional Lives*

Roe asserts that the compelled disclosure of private information, its compilation, and its subsequent disclosure to law enforcement and the public is punitive. First, he argues that this public disclosure "has a potentially devastating effect on Roe's personal and professional lives." Plt's. Mem. Decl. J. at 7. The Commonwealth counters that such claims are speculative, as there have been no reported incidents of harassment, violence, or discrimination related to the release of sex offender registry information in Massachusetts or in Roe's hometown of Lynn. *See* State Defs.' Mem. at 17–19; State Defs.' Supp.Mem., Exs. A thru C. *But see Doe v. Criminal History Systems Board*, No. 96–6046, 1997 WL 100878, *5 (Middlesex Super.Ct. Feb. 25, 1997) ("Merely because one cannot claim with certainty that negative acts against an offender will occur does not mean that risk to the offender is entirely speculative."). Circuit courts that have addressed this issue have not been persuaded by arguments concerning the risk of physical violence, stigma, or impairment of employment opportunities such as Roe advances here. *See Pataki*, 120 F.3d at 1279 ("Although we do not doubt that the Act has had unfortunate consequences for many subject to its operation, we do not agree that these detrimental consequences suffice to transform the regulatory measure of community notification into punishment."); *Verniero*, 119 F.3d at 1101–05 (holding that only "extremely onerous" direct effects are sufficient to make a remedial statute punitive; harm to reputational interests and the risk of private violence not condoned by government are indirect effects of community notification); *Russell*, 124 F.3d at 1092–93 (concluding that the effects inquiry does not include consideration of illegal reactions by the public).

These cases make clear several important principles of the effects inquiry. First, punishment is assessed from an objective perspective not a subjective perspective, "as even remedial sanctions carry the 'sting of punishment'" in the eyes of the person upon whom they are applied. *Department of Revenue v. Kurth Ranch*, 511 U.S. 767, 777 n. 14, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994). Second, the effects of a statute having a remedial purpose must be extremely burdensome to constitute punishment. *See Pataki*, 120 F.3d at 1279 (citing cases); *Verniero*, 119 F.3d at 1101–02 (same). Third, it is the direct effects, not the indirect effects of a statute, that must be assessed. Public stigma or ostracism, vigilantism, loss of employment are indirect effects of public disclosure provisions which are neither encouraged, condoned, nor tolerated under the Act. Guided by the reasoning of these decisions, this Court concludes that the potential effect on Roe's personal and professional life is not punitive.

#### 2) *Greater Disclosure of Information*

For the public disclosure provisions to pass constitutional muster, they must be "reasonably related" to the legislative purpose: a perfect fit is not required. *See Verniero*, 119 F.3d at 1097–98; *Pataki*, 120 F.3d at 1281–83. The central inquiry is whether the public disclosure provisions of this Act are carefully tailored to meet the objectives of the legislature, i.e., providing law enforcement and, under certain circumstances, the public with information about potential recidivists in order to prevent reoffense and to assist in the investigation, apprehension, and prosecution of a re-offense. *See* House Bill No. 5949.

#### a) *Community Notification Provisions*

■ Since the breadth of the community notification provisions varies with an offender's classification, and since Roe has not yet been classified, this Court declines to press this aspect of the analysis further at this time and expresses no opinion thereon.

#### b) *Public Access Provisions*

■ The public access provisions, of course, do not depend on Roe's classification

level so the issues presented by this aspect of the case are ripe for decision.

Pursuant to the Guidelines for Dissemination of Sex Offender Information, under **either** section 178I or 178J, any person who makes a request for information based on his or her need for protection or for the protection of a minor child or another person in his or her custody is entitled to obtain sex offender registry information on any sex offender who is either specifically identified or who resides within a one mile radius of a particular address or resides on a specified street regardless of whether the sex offender, based on his or her prior sex offenses, can be deemed to create a public safety risk to the inquirer.[13] *See* 803 C.M.R. § 1.03(3).

■ The Supreme Judicial Court appears to have rejected precisely this interpretation. *Doe v. Attorney General,* 425 Mass. at 221 n. 6, 680 N.E.2d 97 ("If the Legislature intended that requirements of § 178J are to apply to an inquiry under § 178I, it is unclear why some but not all the requirements of § 178J are included in § 178I in substantially identical language."). Instead that court treats the sections as separate and discrete provisions for the purpose of assessing their remedial or punitive character. *See Id.* at 220–21, 680 N.E.2d 97 (concluding that section 178I lacks an explicit remedial or regulatory purpose). The Commonwealth, nonetheless, asks this Court to reject the Supreme Judicial Court's construction of section 178I as lacking a remedial purpose. State Defs.' Supp.Mem. at 6–13. *See also Doe v. Weld,* 954 F.Supp. at 435 n. 6 (reading the provisions in tandem and applying the prudential requirements of section 178J to inquiries under section 178I). What the Commonwealth asks is beyond the power of this Court to grant. The interpretation of state law by the highest court of the state is conclusive on this Court. *Hamm v. Latessa,* 72 F.3d 947, 954 (1st Cir.1995). That interpretation becomes a part of the state law itself. Because the Supreme Judicial Court has ruled that section 178I lacks a remedial purpose, the provisions of that section cannot be applied to Roe as violative of the Ex Post Facto and Double Jeopardy Clauses.

## VIII. CRUEL AND UNUSUAL PUNISHMENT

■ The Eighth Amendment of the Constitution prohibits the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. The central thrust of the Cruel and Unusual Punishment Clause is to regulate the type or manner of punishment for criminal violations. It limits the types of punishment imposed, prohibits punishment that is "grossly disproportionate to the severity of the crime," and imposes some substantive limits on the conduct that can be classified as criminal. *Ingraham v. Wright,* 430 U.S. 651, 667, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977). The clause is applicable only if the government imposition is in the nature of punishment.

As registration alone does not constitute punishment, it cannot violate the Eighth Amendment. Moreover, while this Court holds that the section 178I constitutes punishment, that provision is proscribed by the Eighth Amendment only if "grossly disproportionate to the severity of the crime." In *Weems v. United States,* 217 U.S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), the Supreme Court held that a sentence of twelve-years imprisonment perpetually shackled and subject to hard labor followed by a lifetime requirement to obtain permission concerning where to reside, imposed for the crime of document falsification was cruel and unusual punishment. Since *Weems,* the proportionality argument has rarely been successful. *See, e.g., Rummel v. Estelle,* 445 U.S. 263, 272, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980)(distinguishing capital punishment as different in kind from other forms of punishment, and considering capital cases of limited

---

**13.** Such disclosure is broader than the public disclosure permitted under New Jersey or Washington's Megan's Laws which have no public access provisions, and under the New York public access provisions as to level-one and level-two sex offenders. *See* N.Y. Correct.L. § 168–*1* (6)(a) & (b); *Pataki,* 120 F.3d at 1282 (establishing a

"900" sex offender telephone inquiry number through which an inquirer can obtain 1) the name and risk of recidivism for a level-one offender who is properly identified and 2) the name, approximate address, and background information on a level-two offender).

assistance in other cases). In *Rummel*, the Supreme Court held that even a mandatory life sentence imposed pursuant to a recidivist statute for a petty larceny violation did not constitute cruel and unusual punishment. *Id.* at 284–85. Therefore, although section 178I constitutes punishment, it is not punishment of the requisite severity to violate the Cruel and Unusual Punishment Clause.

## IX. BILL OF ATTAINDER

■ The prohibition against the passage of bills of attainder extends to Congress and the States. U.S. Const. art. 1, § 9, cl. 3; § 10, cl. 1. It forbids "legislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial." *United States v. Lovett*, 328 U.S. 303, 315, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). The Bill of Attainder Clause has two elements: 1) specificity; and 2) punishment. The fact that a statute imposes burdens on some persons or groups does not constitute a per se violation of the Clause. *Nixon v. Administrator of Gen. Serv.*, 433 U.S. 425, 471, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). The specificity element is met where persons or groups are designated based on irreversible past conduct. *See, e.g., Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*, 468 U.S. 841, 847, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984) ("When past activity serves as 'a point of reference for the ascertainment of particular persons ineluctably designated by the legislature' for punishment the Act may be an attainder.") (quoting *Communist Party of United States v. Subversive Activities Control Board*, 367 U.S. 1, 87 [1961, 81 S.Ct. 1357, 6 L.Ed.2d 625]). Here, the Act satisfies this specificity element as to Roe, as it applies to any person who has been convicted of a particular sex offense since August 1, 1981.

The fact that the registration and public disclosure provisions impose burdens on convicted sex offenders, however, does not violate the Bill of Attainder Clause. The Supreme Court has delineated three inquiries for determining whether such burdens constitute impermissible punishment: "(1)

whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Serv. Sys.*, 468 U.S. at 852 (quoting *Nixon*, 433 U.S. at 473, 475–476, 478).

Neither the registration nor the public disclosure provisions fit into one of the historical categories of legislative punishment under bills of attainder. The type of sanctions historically deemed as punishment under bill of attainder clauses were death, imprisonment, banishment, punitive forfeiture, and the restriction of a particular persons or groups from certain professions. *Nixon*, 433 U.S. at 473–75. As the Act does not impose these historical forms of punishment, this Court must resort to the remaining two inquiries. Both inquiries are similar to the intent-effects analysis that the Court has already discussed under the Double Jeopardy and Ex Post Facto Clauses. Thus, that analysis disposes of this issue as well. The Court concludes that the registration and public disclosure provisions, save for section 178I, do not constitute punishment, inasmuch as the legislative purpose and intent was nonpunitive and the effects are not sufficiently severe to negate the nonpunitive purpose. For that reason, Roe's Bill of Attainder challenge must fail.

## X. EQUAL PROTECTION

■ Roe asserts that the registration and public disclosure provisions of the Act violate his right to equal protection under the United States Constitution. The Equal Protection Clause of the Fourteenth Amendment states that "[n]o state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The standard of assessment concerning alleged violations of the equal protection clause depends on the class of persons or the interest affected by the law at issue. Laws dealing with suspect classifications or fundamental rights are subject to strict scrutiny and quasi-suspect classifications, like

gender, are subject to intermediate scrutiny. All other classifications need only be rationally related to a legitimate government interest. *See, e.g., Federal Communications Comm'n. v. Beach Communications Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) ("In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable basis for the classification." [citations omitted]).

Persons who commit certain sex offenses and are classified as sex offenders are neither part of a suspect nor a quasi-suspect classification. Roe does not argue otherwise. Therefore, the rational-relationship test applies to the alleged equal protection violation. Since courts owe a great deal of deference to the legislative factfinding undergirding classifications subject to the rational-relationship test, *see Terry v. Electronic Data Sys. Corp.,* 940 F.Supp. 378, 382 (D.Mass.1996), Roe bears a heavy burden in seeking to demonstrate the unconstitutionality of this legislation under the Equal Protection Clause.

Roe avers that he "is entitled to be treated as an individual and not classified with other sex offenders whom, unlike Roe, the Commonwealth has not agreed are not 'sexually dangerous persons.' " Plt.'s Supp.Mem. at 14. In short, Roe argues that the registration and public disclosure provisions are overinclusive. A similar argument was addressed by the New Jersey Supreme Court in *Poritz* and rejected. *Poritz,* 662 A.2d at 413–14. In that case, the plaintiff averred that the application of the registration and community notification provisions were overinclusive because unlike other sex offenders he had successfully completed a treatment program for repetitive compulsive offenders and was determined to be no longer dangerous. The New Jersey Supreme Court rejected this overinclusivity argument reasoning that the rationality of legislation is assessed by examining the relationship between the means and the ends of the legislation. "Equal protection does not preclude the use of classifications, but requires only that those classifications not be arbitrary." *Poritz,* 662 A.2d at

413 (citing *State v. Mortimer,* 135 N.J. 517, 641 A.2d 257 (1994)). Similarly, in ruling that the community notification provisions of Senate Bill No. 2276 did not violate the equal protection clause due to overinclusivity, the Supreme Judicial Court stated that "[i]f the purpose of the legislation is to guard against sexual offenses, surely it is rational to proceed by extending the class of persons to whom the regulatory scheme applies to those who have been convicted of sexual offenses in the past." *Opinion of the Justices,* 423 Mass. at 1232–33, 668 N.E.2d 738. For both courts, the fact that the degree of community notification would be determined on an individualized basis made the community notification provisions rationally related to the legitimate government interest of protecting the public from recidivistic behavior by a sex offender. *See Poritz,* 662 A.2d at 413 ("Plaintiff's classification as a sex offender subject to the Notification Law is based on the distinguishing characteristic that he was convicted of one of the enumerated sex offenses. His classification as Tier One, Two, or Three for notification purposes will also be based on his individual characteristics as they relate to the risk that he will commit another offense."); *Opinion of the Justices,* 423 Mass. at 1232–33, 668 N.E.2d 738.

Roe's classification as a sex offender subject to the registration and public disclosure requirements of the Act is due to his commission of one of the delineated sex offenses. His risk of recidivism is determined by an individual assessment using the Guidelines for Classification promulgated by the Sex Offender Registry Board. *See* 803 C.M.R. § 1.02. Classification as a sexually dangerous person is not related to classification as a sex offender. The fact that the sex offender classification includes persons who are not sexually dangerous persons or who do not appear to pose a threat to children does not invalidate a legislative classification that is rationally related to a legitimate government interest. Some sex offenders may not be sexually dangerous and the risk posed by such sex offenders to the community may be minimal, but that does not mean that the application of the registration and public disclosure provisions violates the Equal Protection Clause. The Massachusetts legislature

could reasonably have assumed that providing law enforcement and, where necessary, community organizations and individuals likely to encounter a sex offender with relevant information was a reasonable means to assist law enforcement efforts to protect communities and to enable appropriate community members to take action to protect themselves. Imperfections in the classification will not constitute a violation of the equal protection clause unless based on invidious discrimination. *See Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 489, 75 S.Ct. 461, 99 L.Ed. 563 (1955). "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classification made by its laws are imperfect." *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970); *see also Poritz,* 662 A.2d at 413–14. As long as the relationship between the classification and the government purpose is not "so attenuated as to render the decision arbitrary or irrational," it does not violate the Equal Protection Clause. *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 446–47, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). There is no evidence, indeed no suggestion, that the Massachusetts provision at issue here reveal a "bare ... desire to harm a politically unpopular group," *United States Dep't of Agriculture v. Moreno,* 413 U.S. 528, 534, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), or that they are "inexplicable by anything but animus," *Romer v. Evans,* 517 U.S. 620, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996). The Massachusetts Legislature could reasonably have assumed that requiring sex offenders to register and to be subject to the notification provisions would advance the law enforcement and community protection objectives of the Act. Roe is treated no differently than similarly-situated felons convicted of a sex offense. Moreover, Roe's danger of recidivism will be made by the Sex Offender Registry Board through a process of individualized assessment.

## XI. PROCEDURAL DUE PROCESS

Roe avers that the public disclosure of his sex offender registry information without sufficient due process violates his protectible liberty interest in privacy and reputation.

The Due Process Clause of the Fourteenth Amendment of the United States Constitution provides that "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To assess the merits of this claim, this Court must conduct a two-step inquiry: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citations omitted).

### A. DEPRIVATION OF A LIBERTY OR PROPERTY INTEREST

A protected liberty or property interest devolves from either the Due Process Clause of the United States Constitution or the laws of the state. *Sandin v. Conner,* 515 U.S. 472, 483–84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Wolff v. McDonnell,* 418 U.S. 539, 558–60, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Here, Roe contends that he has a protected liberty interest in privacy and reputation. The Supreme Court has expressly held that harm to reputation alone does not implicate the procedural due process guarantees of the Fourteenth Amendment. *Paul v. Davis,* 424 U.S. 693, 701–02, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Reputational harm or stigma must be coupled with a loss of or adverse effect on a person's prior legal status or rights. *Id.* at 707–09 (interpreting the Court's language in *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)); *see also Artway,* 81 F.3d at 1268–69 (holding harm to reputation interest due to the registration requirement insufficient to constitute a due process deprivation). To satisfy the *plus* requirement of the *Paul* 'stigma-plus' standard, Roe, borrowing from the New Jersey Supreme Court's reasoning in *Poritz,* argues that his right of privacy interest in the nondisclosure of private information is violated by the public disclosure provisions of the Act. *See Poritz,* 662 A.2d at 417–19 (holding that a sex offender has a protectible privacy interest in the non-disclo-

196

sure of his home address and, therefore, due process of the law is required prior to disclosure). This violation, he maintains, coupled with reputational harm suffices to implicate due process guarantees.

The Supreme Court has recognized that there is a right of personal privacy under the Constitution. *See Roe v. Wade,* 410 U.S. 113, 152, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)(citing cases). "[O]nly personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty' are included in this guarantee of personal privacy." *Id.* (citation omitted). The right of personal privacy encompasses at least two different kinds of privacy interests: 1) interest in the non-disclosure of private information, and 2) "interest in independence in making certain kinds of important decisions." *Whalen v. Roe,* 429 U.S. 589, 599–600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977); *see also Roe v. Wade,* 410 U.S. at 152–53; *Paul v. Davis,* 424 U.S. at 713. The former interest has been labeled the confidentiality interest, *see Borucki v. Ryan,* 827 F.2d 836, 840, n. 6 (1st Cir.1987), and has been characterized by the Supreme Court as the "right of an individual not to have his private affairs made public by the government." *Whalen,* 429 U.S. at 600 n. 24 (quoting Kurland, *The Private I,* Univ. of Chicago Magazine, 7, 8 [Autumn 1976]). The latter interest has been labeled as the autonomy interest, *see Borucki,* 827 F.2d at 840, n. 6, and embraces those matters relating to marriage, procreation, contraception, family relationships, and child rearing and education. *See Whalen,* 429 U.S. at 600 n. 26. It is the confidentiality interest in the right of privacy that Roe contends is infringed by the registration and public disclosure provisions of the Act and, when coupled with the harm to his reputation, establishes a sufficient protectible privacy interest to be entitled to procedural due process.

Whether Roe has a protectible privacy interest depends on whether he has a constitutional right to privacy in any of the information made public under the community notification provisions of the Act.[14] While courts have differed on the parameters of this privacy interest under the Constitution of the United States, here Roe, as a Massachusetts citizen, has a protectible liberty interest in, privacy and reputation created by Article 12 of the Massachusetts Declaration of Rights. In *Doe v. Attorney General,* the Supreme Judicial Court has concluded that a level-one sex offender has a protectible liberty interest under the Massachusetts Constitution that entitles the offender to a pre-deprivation hearing to determine whether he should be required to register and, if so, whether public notification is required. *Doe v. Attorney General,* 426 Mass. at 143–44, n. 8, 686 N.E.2d 1007 ("We have identified a State constitutional right that entitles a person in the position of the plaintiff to procedural due process under both Constitutions, without regard to whether such a person has an independent federally protected liberty or property interest." [citing Verniero, 119 F.3d at 1105–06]).[15] This Court agrees with the reasoning of Superior Court Justice Botsford that this liberty and privacy inter-

**14.** Under the community notification provisions, the police shall disseminate to organizations or individuals likely to encounter the sex offender: 1) name of the offender; 2) home address; 3) work address; 4) sex; 5) race; 6) height; 7) weight; 8) eye and hair color; 9) photograph; 10) conviction data, i.e., type of offense and date of conviction. Where a person requests information regarding a sex offender or the presence of a sex offender in his or her community, the police shall disseminate the following information about the sex offender: 1) name; 2) home address, if within the specified geographic area; 3) work address, if within the specified geographic area; 4) sex; 5) race; 6) height; 7) weight; 8) eye and hair color; 9) photograph; 10) conviction data. 803 C.M.R. § 1.03(4).

**15.** The Supreme Judicial Court explained that:

> The combination of the following circumstances persuades us that the plaintiff has a liberty and privacy interest protected by the Constitution of the Commonwealth that entitles him to procedural due process: (1) the requirement that he register with local police; (2) the disclosure of accumulated personal information on request; (3) the possible harm to his earning capacity; (4) the harm to his reputation; and, most important, (5) the statutory branding of him as a public danger, a sex offender.
> That statutory classification implicitly announces that, in the eyes of the State, the plaintiff presents a risk of committing a sex offense.

> *Doe v. Attorney General,* 426 Mass. at 144, 686 N.E.2d 1007.

est "belongs to all persons who qualify as 'sex offenders' under the Act [as] [t]here is nothing in [*Doe v. Attorney General*, 426 Mass. 136, 686 N.E.2d 1007 (1997)] which suggests that the extent of a sex offender's liberty and privacy interest implicated by the requirements of the Act turns on the nature of the sex offense which he committed or the particular facts of the case." *Doe v. Sex Offender Registry Board*, 1997 WL 819765 at *3. Under the Fourteenth Amendment to the United States Constitution, this protectible liberty interest cannot be infringed without due process.

## B. DETERMINING THE PROCESS DUE

■ An interest created and protected by state law constitutes a liberty or property interest which government cannot withdraw without procedural due process. *See Paul v. Davis*, 424 U.S. at 711–12. *Cf. Doe v. Sex Offender Registry Board*, 1997 WL 819765, *3. Due process is a flexible concept whose parameters are determined by the particular situation. In determining the level of process due a court must balance three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Here, Roe's privacy interest affected by his classification as a sex offender can be summarily characterized as avoiding "the statutory branding of him as a public danger," *Doe v. Attorney General*, 426 Mass. at 144, 686 N.E.2d 1007, and its attendant impact on his reputation, employment opportunities, and ability to control the disclosure of personal information.

Pursuant to the Guidelines for Classification of Sex Offenders, the Sex Offender Registry Board considers nineteen factors as well as any victim impact statement(s) and any material submitted by the sex offender in assessing a sex offender's risk of reoffense. A score is given to each of the nineteen factors (i.e., low, moderate, high). The risk level is determined based on the category of risk with the highest number. This rating is adjusted upward or downward based on other factors and additional information. The Guidelines require that a sex offender be rated a high-risk offender if one of five override provisions apply to the sex offender. 803 C.M.R. § 1.02(4). A contrary rating is permitted only where the board finds a compelling justification.

The government's interest is apparent: the protection of children and other vulnerable persons from known recidivistic sex offenders through prompt community notification. As noted by other courts, the government also has an interest in ensuring that its registration and notification system is fair and accurate in order to prevent the injury to a sex offender's privacy interests caused by an erroneous classification. *See, e.g., Verniero*, 119 F.3d at 1107–08.

Under the Act, a person who is classified as a level-two or level-three sex offender may seek judicial review of this risk designation and the attendant community notification plan. Mass.Gen. Laws ch. 6, § 178M. This risk designation may be modified, however, "only if such designation is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* This process is entirely different from the procedure for determining a sex offender's risk of recidivism and his or her community notification plan proposed in Senate Bill No. 2276 and held constitutional in the *Opinion of the Justices.*

In the *Opinion of the Justices,* the Supreme Judicial Court Justices opined that Senate Bill No. 2276's procedures for determining a sex offender's risk of recidivism were constitutionally adequate. 423 Mass. at 1230–31, 668 N.E.2d 738. These provisions required that a Superior Court "make a final determination regarding the risk of re-offense and the community notification plan." Senate Bill No. 2276. The Superior Court was to consider the recommendation of the Sex Offender Registry Board and was to provide the sex offender, if requested, with

an opportunity to appear and be heard. The bill provided for the appointment of counsel for indigent sex offenders. The rules of evidence were not applicable and the court could consider any materials used by the board "and any other information that the court deems useful in assessing the risk of re-offense." *Id.* Lastly, the proceedings and its records were to be confidential.[16]

Roe avers that "[he] is entitled to an opportunity to appear and be heard *before any public disclosure* of registry data occurs pursuant to the Act." Plt.'s Supp.Mem. at 20 (emphasis in original). Roe relies on the reasoning of the New Jersey Supreme Court in *Doe v. Poritz* holding that an review of a sex offender's classification by "an independent decision-maker" is required prior to level-two and level-three notification. 662 A.2d at 417–21.

The New Jersey Supreme Court concluded that:

> First, the private interests in privacy and reputation are significant. Second, additional safeguards would ensure that deprivations of those interests occur only when justified by the risk posed by the offender. Last, the State interest in prompt classification and notification will not seriously be burdened by additional safeguards, and any resulting burden is justified by the benefits of ensuring accurate classification.

*Poritz,* 662 A.2d at 421; *see also Verniero,* 119 F.3d at 1106–11.

As noted above, Justice Botsford, relying on the Supreme Judicial Court's decision in *Doe v. Attorney General,* 426 Mass. 136, 686 N.E.2d 1007 (1997), has preliminarily enjoined, as a denial of procedural due process, the application of the public disclosure provisions to a level-three sex offender, requiring instead an individualized pre-classification hearing for the plaintiff. *Doe v. Sex Offend-*

*er Registry Board,* 1997 WL 819765 at *9; *see also Doe v. Sex Offender Registry Board,* No. 97–571; *Doe v. Sex Offender Registry Board,* No. 97–198. In view of these Superior Court decisions, this Court need not— indeed, ought not—press this aspect of the analysis further.

 In Massachusetts the law is clear that public officials and agencies need not be subjected to court order to carry out the law as the courts interpret it. Rather, there is a strong presumption that the Commonwealth officials and agencies will follow the law as the courts declare it. *Benefit v. City of Cambridge,* 424 Mass. 918, 927, 679 N.E.2d 184 (1997). Therefore, even though, the orders of the Justices of the Superior Court are preliminary only and thus not entitled to res judicata or issue preclusive effect against the Sex Offender Registry Board, *Kuzinich v. County of Santa Clara,* 689 F.2d 1345, 1350–51 (9th Cir.1982), and even though those orders, by their terms, benefit only the plaintiffs named therein and not Roe, there is every reason to expect that, until those decisions are affirmed or reversed on appeal, the Sex Offender Registry Board will afford to Roe the same procedural protections as are required for the similarly situated plaintiffs in the cited Superior Court cases. Accordingly, in order to allow the Commonwealth's administrative and judicial processes to work themselves through to conclusion unimpeded—and fully expecting that these processes will yield final authoritative determinations of the rights and duties of the litigants under the Constitution of Massachusetts, which determination ought precede any explication of the same matters under the United States Constitution, *Bellotti,* 428 U.S. at 146–50— this Court will say no more, contenting itself with administratively closing this case, while

---

**16.** This Court does not address the issues of burden and standard of proof as these issues were not raised by Roe. Courts who have considered these questions have allocated the burden of · proof to the government, i.e., the entity advancing the classification scheme, as a matter of constitutional due process. *See Verniero,* 119 F.3d at 1106–09; *Doe v. Sex Offender Registry Board,* No. 97–571 at 23–26; *Doe v. Sex Offender Registry Board,* No. 97–198 at 30–33. These same courts, however, have reached different

conclusions about the standard of proof due to how the risk of error should be distributed between the litigants based on the assessment of the degree of harm to the sex offender versus the government from an erroneous determination. *Compare Verniero,* 119 F.3d at 1110–11 (clear and convincing evidence) *with Doe v. Sex Offender Registry Board,* No. 97–571 at 26 (preponderance of the evidence) *Doe v. Sex Offender Registry Board,* No. 97–198 at 31–33 (same). This Court expresses no opinion on these points.

retaining jurisdiction so that, if necessary, this aspect of the case may be explored further on a more complete record at an appropriate time.

## XII. CERTIFICATION

This is a rapidly evolving area of the law in Massachusetts. As yet, the Supreme Judicial Court has not had occasion to comment on the role of the Guidelines in interpreting the Act. Moreover, the preliminary injunctions issued in the Superior Court have caused the introduction of bills now pending in the Massachusetts Legislature which seek to remedy perceived flaws in the Act. *See* House Bill No. 5352 (Mar. 5, 1998) (proposing to amend the entire Act). In these circumstances, if either party proposes that this Court certify a question or questions of unsettled Massachusetts law to the Supreme Judicial Court, and wishes to submit, within thirty days of the date of this decision, a precisely framed and explained proposal for certification, the Court will consider it. *See RLI Ins. Co. v. General Star Indem. Co.*, 997 F.Supp. 140, 152–153 (D.Mass.1998) (Keeton, J.) (outlining this procedure).

## XIII. CONCLUSION AND ORDER

A. Since the Supreme Judicial Court has declared that section 1781 has no remedial purpose, this Court declares that its provisions cannot be enforced in any respect against John Roe.

B. Save as to paragraph A above, and those aspects of this opinion where this Court presently declines to express an opinion for prudential reasons concerning the interplay of the state and federal constitutions, this Court declares the Act, in all other respects, constitutional when tested against the provisions of the Constitution of the United States.

C. Since the case is not finally resolved by this memorandum and order, the Court must resolve the question of interim relief, if any. While the Court finds that Roe has established a reasonable likelihood of irreparable injury should the community notification and public access provisions of the Act be applied to him, the Court also finds no

reasonable likelihood that these provisions will be so applied without a constitutionally appropriate pre-classification hearing. In these circumstances, the public interest would not be served by a preliminary injunction that would trump the working-out of the Commonwealth's administrative and judicial processes.

D. In order to allow for consideration of possible certification, not less than thirty days from the date of this order this case will be administratively closed. Either party may restore the case to the trial list once Roe's pre-classification hearing has been held and Roe has been classified, or earlier for good cause shown.

It is **SO ORDERED.**